UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civ. No. 005 CV 10152 NMG

)
PAMELA J. HILCHEY,                     )
                                       )
              Plaintiff,               )
                                       )
v.                                     )
                                       )
CITY OF HAVERHILL, *et al.*,           )
                                       )
              Defendants.              )
_____)

PLAINTIFF'S STATEMENT OF FACTS
IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

Plaintiff, Pamela J. Hilchey, by her attorney, Eric P. Finamore, hereby submits her

concise statement of material facts, pursuant to Rule 56 of the Federal Rules of Civil

Procedure and Local Rule 56.1, in opposition to defendants' motion for summary

judgment.

CONCISE STATEMENT OF TRIABLE
MATERIAL FACTS IN OPPOSITION
TO DEFENDANTS' CONTENTIONS

Defendants set forth 29 numbered paragraphs of factual contentions in support of

their motion for summary judgment. Defendants' Facts.[1] Set forth immediately below,

---

[1] References in this form are to Defendants City of Haverhill, John J. Guerin, Jr., Stephen
Brighi, Kim Parolisi, Lance Dawkins, Alan Ratte, Gary Melanson, John Arahovites,
Victor Pellot, George Dekeon, Jr., and William Leeman's Statement of Undisputed Facts

utilizing the same paragraph numbers as defendants, are those statements which, plaintiff

contends, are inaccurate, as specified.

5.    Plaintiff admits that a Police Incident Report dated October 5, 2001

regarding Ms. Hilchey was submitted to the Haverhill Police Department, and further

admits that such Police Incident Report is accurately reflected as Exhibit L in defendants'

submissions.    Plaintiff denies, however, that defendants' statement of the facts they set

forth accurately reports the information in Exhibit L.    In particular, Ms. Hilchey denies

that she took the actions of which she was accused by Ms. Sternlieb and Ms. Regan on

October 5, 2001. *See Exhibit A,* Deposition of Pamela J. Hilchey, p. 285, ll. 18 – 19, p.

286, ll. 4 – 9, p. 287, l. 22 – p. 288, l. 17, p. 330, l. 20 – p. 331, l. 17; *Exhibit B,* Plaintiff's

Answers to the City of Haverhill's Interrogatories, No. 3; *Exhibit C,* Plaintiff's Answers

to Phyllis M. Monigle's Interrogatories, Nos. 2, 8.    Additionally, Ms. Hilchey points to

the incident of October 5, 2001, as evidence of the ongoing neighborhood dispute of

which the Haverhill police were aware, and which indicates the lack of probable cause

for her arrest on September 7, 2002. *Exhibit A,* p. 286, ll. 4 – 9, p. 287, ll. 11 – 16, p.

288, ll. 5 – 12.

9.    Plaintiff notes, initially, that the Defendants' statement set forth in this

---

and Legal Issues Pursuant to L.R. 56.1, submitted in support of defendants' motion for
summary judgment, and to the Exhibits annexed thereto. (Dckt. No. 44.)

Plaintiff notes that Local Rule 56.1 does not specify that the movant or the opponent
of a motion for summary judgment pursuant to Rule 56 should submit a statement of
undisputed material facts and a statement of legal elements.  Plaintiff believes that
defendants might have included their statement of legal elements in mistaken reliance
upon Massachusetts Superior Court Rule 9A(b)(5).  Plaintiff includes all of her legal
authorities and the rules she contends they represent in her brief in opposition to
defendants motion for summary judgment, and not in a separate statement.

paragraph is ambiguous: "the Haverhill Police relied on the three witness statements."[2]

Plaintiff denies that the police officers relied upon written statements, because Officer

Melanson's Supplemental Report shows that no written statements had been taken at the

time the decision to arrest the plaintiff was made. *Exhibit D*, Supplemental Report of

Officer Melanson.

First, there is ample support in the summary judgment record that (i) the decision

was made to seek the criminal complaint within minutes of the original call by Ms.

Monigle to the Haverhill Police, without the most rudimentary elements of an

investigation, and (ii) the decision was made by someone other than Officer Melanson,

who was titularly the "front officer" who was "in charge" of this investigation. (*Exhibit

D*); *Exhibit E*, Deposition of Gary O. Melanson, p. 44, l. 22 (Sergeant Pellot directed him

to apply for the criminal complaint within minutes of the first response to Ms. Monigle's

telephone call); p. 60, ll. 15 – 20 (Officer Melanson had no idea why Ms. Hilchey was

not interviewed prior to the application for a criminal complaint); p. 95, l. 4 – p. 97, l. 9

(Officer Melanson testified that [i] the history of disputes in the neighborhood was the

reason for not seeking the account of the only adult witness, Ms. Hilchey, prior to the

application for a criminal complaint *rather than the testimony of the three complaining

witnesses, each of whom was under ten years of age*; that [ii] the Haverhill Police

Department had determined that "it was time to do something," that [iii] the decision was

made to apply for the criminal complaint *before* the written statements of the children

were taken at the Haverhill Police Station for submission with the application, and that

---

[2] Paragraph 9 is, in full: "The Haverhill Police relied on the three witness statements
when it sought a warrant for the arrest of the plaintiff from the Haverhill District Court.
(See Exhibit H and O)"

[iv] Officer Melanson "was just going by what they told me," *i.e.*, by what his superiors told him to do); *Exhibit F*, Deposition of Phyllis Monigle Dep. Tr., p. 68, ll. 16 – 21 (Sergeant Pellot said, within minutes of Ms. Monigle's initial call to the Haverhill Police, "we have – you know, we have to do something"), p. 71, l. 14 (Officer Melanson and Sergeant Pellot concluded their investigation on the morning of September 7th , 2002, within fifteen minutes of arriving at the Monigles').

Second, Ms. Hilchey notes that the truth of the statement is controverted by Lieutenant Dorr himself: "based on the seriousness of the allegations, I contacted the clerk's office after reviewing this information." *Exhibit G*, Dorr Affidavit ¶ 4 (included as Exhibit O in defendants' motion papers). Lieutenant Dorr, pointedly, does not refer to the strength, quantity, or clarity of the evidence. Indeed, the crime alleged – violation of M.G.L. c. 265, § 15B(b) – carries a maximum sentence of five years in state prison, and it is this "serious charge" (rather than Ms. Hilchey's prior failure to appear) that was given for issuing a warrant to arrest her on the weekend rather than waiting for the ensuing business week. *Exhibit H*, Arrest Warrant (included as Exhibit B in defendants' motion papers). The seriousness of a crime, however, has nothing to do with whether there was probable cause. Plaintiff vigorously argues that Lieutenant Dorr's affidavit provides no evidentiary basis whatsoever for believing that the grounds, reasons, and causes of the application by the Haverhill Police in applying for the criminal complaint was the totality of the evidence pertaining to what Ms. Hilchey did or did not do.

Third, there are substantial inconsistencies between the facts set forth in Officer Melanson's Narrative/Summary (*Exhibit I*) submitted in support of the application and the written statements of the children, which preclude the truth of what was initially

reported at the Monigles' house when Officer Melanson and Sergeant Pellot first responded and the truth of what is set forth in the written statements.  If the information made available to Officer Melanson and Sergeant Pellot on the morning of September 7th, 2002 is true, then the accounts given in the written statements created in the afternoon of September 7th, 2002 cannot be.

The finder of fact could determine that the initial report of Ms. Monigle, Katelyn Monigle, Matthew Monigle, and Amanda Bastarache to the Haverhill Police was that Ms. Hilchey drove her car at them when they were at a bus stop at the intersection of Elliott Street and Pear Tree Road.  *Exhibit J,* Deposition of Victor Pellot, p. 14, ll. 12 – 22 (Officer Melanson reported to him, Sergeant Pellot, when Sergeant Pellot arrived at 49 Pear Tree Road on the morning of September 7th, 2002 "that Pamela Hilchey had allegedly . . . driven her car towards some children at a bus stop"); *Exhibit K,* Police Incident Report, Sept. 7th, 2002 (the operative events occurred "at the end of the development"); *Exhibit E,* p. 67, l. 21 – p. 69, l. 17, Exs. 1, 2, 3 (one end of the development is at the intersection of Elliott Street and Pear Tree Road; Route 51 of the MVRTA goes through that intersection; there is no bus route at the other end of the development indicated by Officer Melanson); *Exhibit I*  (Ms. Monigle told Officer Melanson and Sergeant Pellot that the children "were riding their bicycles at the entrance of Pear Tree Lane [*i.e.* Pear Tree Road]" when "Pamela Hilchey drove into the development").

The afternoon statements are all inconsistent with this location; instead, the place the location directly in front of the Monigle and Regan residences and not far from Ms. Hilchey's residence, which was at the corner of Courtland Road and Pear Tree Road.

*Exhibit L*, written statement of Katelyn Monigle; *Exhibit M*, written statement of Matthew Monigle; *Exhibit N*, written statement of Amanda Bastarache.

Fourth, Officer Melanson – on any of the various witness's accounts – had begun to apply for the criminal complaint before the written statements were taken. *Exhibits D, I, L, M, N.* That application included the account, inconsistent with the afternoon accounts, that the alleged events occurred at or near the intersection of Elliott Street and Pear Tree Road. *Exhibit I.*

All of the foregoing tend to show that the Haverhill Police did not "rely" in the sense of "base their reasonable, considered, and objective judgment" on the written accounts generated in the afternoon of September 7th, 2002 when they went ahead with their application for a criminal complaint against Ms. Hilchey for assault with a dangerous weapon.

17.    Officer Melanson's Narrative Report/Summary, dated September 7, 2002 (*Exhibit I*, cited in support by defendants), differs materially from the facts set forth in ¶ 17. Namely, Officer Melanson's document states that the children were riding their bicycles "at the entrance of Pear Tree Lane [*i.e.* Pear Tree Road]," at the intersection of Elliott Street and Pear Tree Road.

18.    Plaintiff does not dispute that Officer Melanson spoke with Katelyn Monigle, Matthew Monigle, and Amanda Bastarache, as set forth in *Exhibit I* and *Exhibit K*, Police Incident Report dated September 7, 2002. However, plaintiff denies that these oral statements are the same as those that the foregoing three children made in the afternoon at the Haverhill Police station and that were submitted by Lieutenant Dorr in support of the application for a criminal complaint.

20.    Plaintiff does not dispute that Officer Melanson testified (*Exhibit E*, p. 118, ll. 5 – 7):

Q:    In interviewing the children, did you find them to be credible at that time?

A:    Yes, I did.

However, whether the information was reliable and accurate could not be determined without more: namely, the kind of balanced, objective, and reasonable investigation that was, in point of fact, *not* conducted in this case. Ms. Hilchey was not interviewed (*Exhibit E*, p. 60, ll. 15 – 20, p. 95, ll. 14 - 16); no physical investigation was undertaken (*Exhibit E*, p. 59, ll. 5 – 7); Officer Melanson did not know where, physically, the assault occurred (Melanson Dep. Tr., p. 26, ll. 21 – 22); the morning and afternoon accounts of where the assault occurred differed sharply (*Exhibits I, K, L, M, N*); and Officer Melanson wrote, on September 8, 2002, that he was instructed to apply for the criminal complaint *in advance of, and without regard to what was shown or not shown by, the interviews at the Haverhill Police station that produced the* written statements provided in support of the application for a criminal complaint. *Exhibit D.*.

No "credibility" determination can be made regarding the reliability, accuracy, and completeness of what the children said in light of the foregoing.

21.    Plaintiff does not dispute that Officer Melanson testified (*Exhibit E*, p. 120, ll. 5 – 13):

Q:    In regard to the charges brought against Ms. Pamela Hilchey, officer or detective, whatever they may have been in this particular case, if the interviews conducted with the children did not contain the necessary elements of the charges in which Mrs. Hilchey was brought, would you have still brought forward an application for a complaint?

A:    No.

However, even if Officer Melanson found the witnesses to be credible, their statements were insufficient to establish that Ms. Hilchey had committed a crime for which she was liable to arrest. In particular, plaintiff asserts that criminal assault founded upon an immediately threatened battery requires "proof of intent to cause apprehension," and not merely "proof that the action which constitutes menacing conduct be intentional." *Commonwealth v. Musgrave*, 38 Mass.App.Ct. 519, 524, *aff'd*, 421 Mass. 610, 611 (1996)(explicitly adopting the Appeals Court's opinion). Although at least some of the accounts show that Ms. Hilchey acted intentionally (*i.e.* not by mistake, inadvertence, or accident), there is no indication of any proof that she acted with "intent to cause apprehension."

27.    Plaintiff disputes that the Haverhill Police, after objective, diligent, and adequate investigation, determined that the three witness statements were a reliable, accurate basis upon which to make an application for a criminal complaint for violation of M.G.L. c. 265, § 15B(b). Officer Melanson's Supplemental Report shows that the decision to seek an arrest warrant preceded the taking of the written statements from the witnesses, and was made in the absence of any meaningful investigation. *See supra* at 2 – 7 and the evidentiary materials cited therein.

29.    Plaintiff notes that there is no evidentiary basis cited for ¶ 29, but the undisputed record establishes that charges regarding Matthew Monigle, Kevin Regan, and Amanda Bastarache were dismissed by the prosecution by *nolle prosequi* and that only the charge regarding Katelyn Monigle was tried, after which a jury acquitted Ms. Hilchey.

8

**Additional Facts Submitted by Plaintiff**

In accordance with Local Rule 56.1, plaintiff proffers the following additional facts in support of her claims and in opposition to the defendants' motion.

1.      On September 7, 2002, at approximately 8:00 a.m., plaintiff Pamela J. Hilchey left her house to go for a walk at Kenoza Lake in Haverhill.  On her way, she observed Matthew and Katelyn Monigle and Amanda Bastarche sitting on a stone wall at the end of the housing development in which she (and the Monigles) lived.  The children saw her in her car as she was stopped at the stop sign.  *Exhibit A,* Deposition of Pamela J. Hilchey, 147 – 150, 330 – 331; *Exhibit B,* Plaintiff's Answers to Defendants' Interrogatories, Answer No. 1.

2.      The plaintiff took her walk and returned to the housing development.  She drove towards her house, and in the process remembered that she had forgotten to buy bagels.  Therefore, instead of turning into her street, she drove past the entrance of her street and her driveway and continued up the Pear Tree Road.  In front of the Monigle's house, which was opposite the plaintiff's on Pear Tree Road, she observed the same three children on bicycles.  Each had a foot down on the pavement, and each stared at the plaintiff as she drove past.  *Exhibit A,* Deposition of Pamela J. Hilchey, 147 – 150, 330 – 331; *Exhibit B,* Plaintiff's Answers to Defendants' Interrogatories, Answer No. 1.

3.      Ms. Hilchey drove past her street and her driveway because she was driving a truck, which was a new vehicle for her, and she did not feel comfortable backing it out of the driveway.  *Exhibit A,* Deposition of Pamela J. Hilchey, p. 330 – 331.

4.      After passing the three children, the plaintiff proceeded to the end of Pear Tree Road, turned left onto Russett Hill Road, circling through the development, and

proceeding to buy her bagels. She did not pass by the children again. *Exhibit A,* Deposition of Pamela J. Hilchey, 147 – 150, 330 – 331; *Exhibit B,* Plaintiff's Answers to Defendants' Interrogatories, Answer No. 1.

5.     As a result of these events, Phyllis Monigle called the Haverhill police department, and reported that the plaintiff had driven her vehicle "straight at the kids." However, Ms. Monigle also told the police officer taking the call that "I did not see it." The defendants produced a digital record of calls made to and from the Haverhill Police Department on September 7, 2002, an unofficial transcript of which is attached hereto as Exhibit P.

6.     During the course of the ensuing police investigation, Ms. Hilchey was not interviewed (*Exhibit E,* p. 60, ll. 15 – 20, p. 95, ll. 14 - 16); no physical investigation was undertaken (*Exhibit E,* p. 59, ll. 5 – 7); investigating Officer Melanson did not know where, physically, the assault occurred (*Exhibit E,* p. 26, ll. 21 – 22); and the morning and afternoon accounts of where the assault occurred differed sharply (*Exhibits I, K, L, M, N*). Nevertheless, on the statements of children, the oldest of whom was nine years old, the police department made the decision to apply for a criminal complaint against Ms. Hilchey for assaulting the children with her motor vehicle. *Exhibit D, Exhibit E, generally.*

7.     According to Officer Melanson's Supplemental Report, he was instructed to apply for the criminal complaint in advance of interviews which were subsequently conducted of the children at the Haverhill Police station that produced the written statements provided in support of the application for a criminal complaint. *Exhibit D.*

8.    It is undisputed that Ms. Hilchey was charged with four counts of assault with a motor vehicle, that three of those counts were dismissed prior to trial, and that the sole remaining count resulted in a finding of acquittal.

9.    The defendants have produced in discovery a Haverhill Police Department Manual, which includes, at 28-1 – 28 – 13, a section entitled "Preliminary Investigations," a copy of which is annexed hereto (*Exhibit O*). The Manual of the Haverhill Police Department directs officers conducting a preliminary investigation to make "[e]very effort . . . to locate, identify, and interview reliable witnesses" and to look for all available physical evidence. The Haverhill Police Manual, Sec. III, "Policies and Procedures," p. 28-2 et seq. The sole witness known to the Haverhill Police who was more mature than nine years old was Ms. Hilchey. Officer Melanson admits that he did not interview her. *Exhibit E*, p. 60.

Respectfully submitted,
PAMELA J. HILCHEY,
By her attorney,

*/s/ Eric P. Finamore*
Eric P. Finamore, BBO # 541872
Weston Patrick, P.A.
84 State Street, Suite 1100
Boston, MA 02109
(617) 742-9310

### CERTIFICATE OF SERVICE
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on August 13, 2007.

*/s/ Eric P. Finamore*

11

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-10152NMG

PAMELA HILCHEY,

       Plaintiff

   vs.

CITY OF HAVERHILL, JOHN J. GUERIN,

STEPHEN BRIGHI, KIM J. PAROLISI,

LANCE A. DAWKINS, ALAN RATTE, GARY J.

MELANSON, JOHN ARAHOVITES,

VICTOR PELLOT, GEORGE DEKEON, JR.,

and WILLIAM LEEMAN,

       Defendants


   DEPOSITION OF PAMELA J. HILCHEY, a witness
called on behalf of the Defendants, pursuant to
the applicable provisions of the Federal Rules
of Civil Procedure, before Jessica L. Bisaillon,
a Registered Professional Reporter, Certified
Shorthand Reporter, and Notary Public in and for
the Commonwealth of Massachusetts, at the
offices of Merrick, Louison & Costello,
67 Batterymarch Street, Massachusetts 02110,
on Monday, November 27, 2006, commencing
at 10:30 a.m.



Page 147

1    assault with a dangerous weapon?

2    A.   Katelyn and Matthew Monigle, Amanda Bastarache,

3         and Kevin Regan.

4    Q.   And are you aware that they gave statements to

5         the police?

6    A.   Yes.

7    Q.   And what do you -- what are you aware that

8         they -- aware of that they alleged you did?

9                    MR. FINAMORE:   Objection.

10   A.   I believe they wrote that I drove towards them in

11        my vehicle.

12   Q.   Okay.  And do you remember seeing them on the

13        street on September 7th, 2002?

14   A.   Three of them, yes.

15   Q.   Which three?

16   A.   The two Monigle children and Amanda Bastarache.

17   Q.   You never saw the Regan boy?

18   A.   No.

19   Q.   Okay.  And what do you remember seeing on

20        September 7th, 2002?

21                    MR. FINAMORE:   Objection.  At some

22        particular time?

23   Q.   When you saw these individuals.

24   A.   I first saw them at the end of my development in

DUNN & GOUDREAU

Page 148

1          the morning around 8:00.

2    Q.   And what were they doing, and what were you

3          doing?

4    A.   I was driving to go for my walk.  And I was

5          stopped at the stop sign.  And Amanda and Matthew

6          were sitting on a stone wall, and Katelyn was

7          standing on the sidewalk facing traffic.  And

8          I -- and a car passed, and Katelyn started

9          dancing for the car.  And they were all laughing.

10         And as Katelyn turned around, she saw me.  And

11         her -- all the smiles came off the kids.

12   Q.   Anything else you remember about when you drove

13         by them at approximately 8:00 in the morning?

14   A.   No.  I just waited until the traffic cleared.  I

15         didn't say anything to them.  I just took the

16         left.

17   Q.   Okay.  And where were you going?

18   A.   For a walk at Kenoza Lake.

19   Q.   And did you do a walk?

20   A.   Yes.

21   Q.   And then did you return?

22   A.   Yep.

23   Q.   And what happened when you returned, if you

24         remember anything?

Page 149

1    A.   I was driving up towards my house.  And as I

2         looked at my garage, I remembered I was going to

3         get bagels.  So rather than turn, I proceeded up

4         the street.  I saw Amanda and Katelyn riding

5         their bikes in the street, and I saw -- there was

6         a car in front of the Monigle house.  And Matthew

7         was at the driver's window like looking in.  And

8         the two girls went over to the side behind the

9         car and had turned their bikes to look at me.

10        And they each had a foot down on the pavement,

11        and they all stared at me as I drove by.

12   Q.   And what time was this at?

13   A.   Approximately 9:00.

14   Q.   And did you know Amanda at that time?

15   A.   Yes.

16   Q.   And did she live in the neighborhood?

17   A.   No.

18   Q.   She was friends with Katelyn?

19   A.   Yeah.  And she was friends with my daughter too.

20   Q.   Okay.  Do you remember anything else about when

21        you drove by them at that time, at 9:00?

22   A.   Just I had the impression that they thought that

23        maybe I was going to tell on what they had done,

24        what I had witnessed them doing at the beginning

Page 150

1     of the development.  Just from the looks on their

2     faces, like I felt like they thought I was going

3     to tell their parents what I had saw them doing

4     earlier.

5  Q.  That they were dancing?

6  A.  Yep.  For the traffic.

7  Q.  Okay.  And then where did you travel in your

8     vehicle at that time?

9  A.  I went to the end of Pear Tree Road, took a left,

10    circled around Russett Hill, and I went back on

11    Pear Tree and took a right and went to Dunkin'

12    Donuts.

13  Q.  And did you travel by them again?

14  A.  No.

15  Q.  And then did you go to Dunkin' Donuts?

16  A.  Yes.

17  Q.  And then did you return to your home?

18  A.  Yes.

19  Q.  And how long did that take from the time when you

20    saw the kids until you returned home?

21  A.  I -- I guess now it's like ten minutes.

22  Q.  Okay.  And did you ultimately learn that the

23    children made allegations against you?

24  A.  Yes.

Page 285

1          No. 8 is, not relating to Kevin Regan, but to

2          Alicia and Robert Regan, what statements did they

3          make to the police in support of your allegations

4          in Paragraph No. 8.

5     A.   I wasn't present, so I don't know.

6     Q.   Do you have any basis for Paragraph No. 8?

7     A.   Just that they made their child available to make

8          the false statements.

9     Q.   Besides making someone available, I'm referring

10         to statements.  Can you please tell me what

11         statements my clients made to support your

12         contentions in Paragraph No. 8?

13    A.   They actually did make some -- I might want to go

14         back, because they did make some statements.

15         There was -- I believe they were called witness

16         reports, and they made statements in there.  And

17         they -- I'm going -- I'm going to recorrect

18         myself too, because Alicia had falsely accused me

19         in 2 -- October of 2001.

20    Q.   I'm referring to the events regarding the

21         children in the street which brought about your

22         eventual arrest.

23    A.   Okay.

24    Q.   Do you -- what statements did Alicia and Robert

1    Regan make in support of your contention of

2    Paragraph No. 8 relative to the incident with the

3    children in the street?

4  A.  I want to say that that -- the statement that

5    Alicia made in 2001 was the foundation for the

6    accusation in 2002.  And in trying to lend

7    credibility to their statement in 2002, I believe

8    those statements in 2001 were -- were done for

9    that purpose.

10 Q.  Will you agree with me that in 2001, there was no

11   further action taken by the police?

12 A.  Yes.

13              MR. FINAMORE:  Objection.

14 A.  I believe so, yes.

15 Q.  Okay.  Keeping that aside for a second, there was

16   no further police action, that was a year prior

17   approximately, again my question, No. 8 -- I'm

18   going to stay on this until we get an answer.

19              I'm asking you for what statements my

20   clients made to support your contention in

21   Paragraph No. 8 either on the day of the incident

22   or shortly thereafter or any time up until the

23   present?

24              MR. FINAMORE:  Objection.

1   A.   I -- I think you're limiting my answer.  I have

2          an answer, but you're limiting it.

3   Q.   I know that.

4   A.   And I have to keep saying that, because --

5   Q.   But my question is, from September 7th onward in

6          relation to your allegations until this complaint

7          was filed, Paragraph No. 8, please tell me what

8          statements were made by my client to the police

9          in support of your contentions in Paragraph

10         No. 8?

11   A.   Until I understand it, I'm still going to have to

12          stand the ground that Alicia making those false

13          statements to the police in October laid the

14          basis.  If police are called repeatedly for the

15          same thing, then they might have a tendency to

16          believe something.

17   Q.   Okay.  Believe what?

18   A.   Believe that I was guilty.

19   Q.   What statements did my clients make to lead the

20          police that you were guilty of this incident in

21          which you were arrested for?

22   A.   On October 5th of 2001, I know that she made the

23          false allegations.  She personally made that --

24          those statements to the police.

Page 288

1    Q.    Okay.  And did the police rely upon the incident

2          of a year prior to arrest you?

3    A.    I -- I believe it was in their mind.

4    Q.    And why do you believe that?

5    A.    It's just like I just said, if a police officer

6          is, you know, called with a complaint about

7          someone repeatedly -- I mean, if it was a

8          one-time instance, they may not believe it.  But

9          if -- if the allegations happened repeatedly, I

10         believe that that would entice the police to

11         believe, gee, this has been going on a long time.

12         Let's finally do something about it.

13   Q.    Okay.  So you're basing Paragraph No. 8 on

14         previous statements made before September 7th,

15         2002?

16   A.    Yes.  The ones that I know about would be prior

17         to that date.

18   Q.    Okay.  And you're referring to the situation on

19         the street with Alicia Regan and her daughter and

20         Jennifer Sternlieb?

21   A.    Sternlieb, yeah.

22   Q.    Sternlieb.  What about Robert Regan?  Was he part

23         of that previous incident?

24   A.    No.

Page 330

1   A.   Back to my house.

2   Q.   You just drove back in your driveway?

3   A.   Yep.

4   Q.   So you got out of your driveway, drove down the

5        street, turned around and came back and went

6        right back in your driveway?

7   A.   Yep.

8   Q.   And the purpose of your trip or your visit was --

9   A.   I don't remember where I was going, but I was

10       upset.  So that's why I went back home.

11  Q.   Initially you didn't go out of the development;

12       you went in deeper to the development?

13  A.   Well, I -- I would have been going -- ultimately

14       I would have been leaving the development, but I

15       would have been taking the long route to view the

16       landscaping.

17  Q.   So that was your intention, to take the long road

18       to view the landscaping?

19  A.   Right.

20  Q.   And when you returned during the incident of

21       September 7th, 2002, you didn't pull in your

22       driveway and make the U-turn there to go get the

23       doughnuts or the bagels you were looking for?

24  A.   You're going to have to repeat that.  I'm sorry.

Page 331

1   Q.   On September 7th, 2002, I believe you testified

2        that you had forgotten to go to Dunkin' Donuts?

3   A.   Right.

4   Q.   And that when you came up to your street or your

5        home, you realized you had forgotten your --

6   A.   Bagels, yep.

7   Q.   -- bagels?  Instead of pulling in your driveway

8        and making a U-turn, you went all the way around

9        and looped around the development?

10   A.   Yep.

11   Q.   Is that a habit of yours?  Do you do that often?

12               MR. FINAMORE:  Objection.

13   A.   I -- it's because I had a new -- I had a -- just

14        had a new vehicle that I had for -- how many

15        days?  I just got it on August 16th.  So maybe

16        three weeks.  And it was a big truck, and I

17        wasn't comfortable backing it up.

18   Q.   Okay.  Now, were you upset that the neighbors had

19        filed a petition with the chief in relation to

20        some of the neighborhood issues that were going

21        on?

22               MR. FINAMORE:  Objection.

23   A.   I don't know when I actually knew when -- I think

24        I didn't know about that until after they

# EXHIBIT B



EXHIBIT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PAMELA J. HILCHEY, | ) | Civil No. 05-10152NMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF HAVERHILL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S ANSWERS TO INTERROGATORIES
## PROPOUNDED BY DEFENDANT, CITY OF HAVERHILL

1.  State your full name, address, and social security number.

    Answer:    Pamela J. Hilchey, 4014 Navajo Court, Rock Hill, SC  29732;
    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.

2.  If you have been convicted of a felony and/or a misdemeanor, describe the
    offense or offenses and when, if applicable, where committed, and under what
    name you were convicted, and when and in what city, county and state [*sic*].

    Answer:    I have never been convicted of a felony or of a misdemeanor.

3.  Please identify in complete detail how the alleged incident(s) that serve as the
    basis of your complaint occurred, stating what you saw and did prior to, during,
    and after each incident and what happened to you in the order in which the events
    took place including what you were doing immediately prior and up to the receipt
    of the injuries alleged in your complaint.

    Answer:    I deny that any "incident" occurred." Assuming, however, that the
    interrogatory refers to events which purportedly constituted a crime for which I
    was arrested and prosecuted, I answer as follows:  I turned into the development
    after having taken a walk.  I was going home, when I realized I had forgotten to
    pick up the bagels I wanted.  I saw the neighborhood children riding their bikes,
    and, as I drove up the street, they were at the side of the road watching me drive
    by.  After I got my bagels, I returned to my home.

4.    Describe all of the injuries and complaints of any nature whatsoever (whether objective or subjective) as a result of this incident(s) of which you, or your doctors are aware or suspect as follows:

a.    List and describe each in specific detail, giving the exact location within or upon your body of all your injuries, and nature of your complaint (whether physical, dental, emotional, nervous, mental or psychological);

b.    If you have completely recovered from each such injury and complaint, state the date you recovered from such injury or complaint;

c.    List separately all of your present disabilities and complaints (whether objective or subjective), the frequency and duration of your complaints of pain, etc., the locations of and degree of any limitations of motion you now have, and a detailed description of any scars you have at the present time, which you attribute to the incident; and

d.    Separately list and describe each of your claimed permanent disabilities.

Answer:    I suffered severe emotional anguish and depression, which has not alleviated.

5.    If, as a result of any injuries, emotional distress, discomfort or embarassment sustained in the incident(s) you were unable to perform any of your normal and usual functions, duties or activities of whatever nature at any time since the incident (which you were able to perform before the incident) state the function, duty, and activity you were unable to perform, and also separately state what functions, duties or activities, if any, you are still unable to perform, and why:

a.    In connection with your work, employment or business;

b.    In activities other than your employment or business, describing in detail the type of such activity (social, recreational, golf, housework, hobby, etc.,) and the extent of the curtailment, limitation or restriction.

Answer:    I am not able to describe all of the disruptions which I have experienced, because they are too extensive to permit a full description herein. In summary, I suffered a loss of reputation, a loss of emotional well-being, and extreme and disabling emotional anguish; I was forced to defend myself against a criminal prosecution which had no basis in fact but which threatened me with incarceration for a substantial period of time. I was forced to spend substantial time and money in mounting a legal defense; I was forced to leave my home and to sell my house, incurring a financial loss; I had to move out of state, first to New Hampshire and then to South Carolina, and I suffered a complete disruption of my life, in each and every one of its aspects, to the present time.

2

6.    State which dates you were so confined, if at all as a result of the injuries, emotional distress, discomfort or embarassment you claim you received as a result of the incident:

    a.    In a hospital and address;

    b.    Confined to your bed and address; and

    c.    Convalescing at home but not confined to your bed, stating the address where convalescing.

Answer:    I was not hospitalized and I was not physically unable to leave my home.

7.    As a result of any injuries, emotional distress, discomfort or embarassment received in this incident, state in chronological order the names and addresses of:

    a.    Each and every hospital, institution, rest home or sanitarium, giving the dates of admission and dates of discharge from each place where you were an in-patient;

    b.    Any hospital, clinic, institution or sanitarium where you have been an out-patient, giving the dates of care, and when all treatments were performed.

Answer:    I was neither admitted to nor was I an outpatient at any hospital or similar institution.

8.    If you received any medical care or any treatment from any doctor, or anyone as a result of injuries, emotional distress, discomfort or embarassment received in said incident, please supply answers to the following:

    a.    The date you first received such care or treatment, and the name and address of the doctor, or other practioner who treated you and where;

    b.    The name and address of each such doctor, or other practitioner, indicating his specialty, if any, whom you have seen for medical care or treatment as a result of injuries received in this incident;

    c.    For what injuries or complaint did each doctor, or other practitioner treat or care for you;

    d.    The dates of care or treatment by each such person;

    e.    The treatment given and the treatment by each such person;

f.   The medication and narcotics prescribed, by who, and for what purpose, where obtained, and the frequency and the period of time from date to date over which taken; and

g.   The nature, extent and duration by dates of any self-administered home care or therapy, and, if recommended by any doctor or therapist, give his name and address.

Answer:    a. – g.  I have been treated by two psychologists, Bonnie Boston of Salem, New Hampshire, and Robert Wells, of Rock Hill, South Carolina.  I take Xanax and Welbutrin for my emotional condition.  I am being treated for Post-Traumatic Stress Disorder.

9.   As distinguished from a treating or attending doctor referred to in the previous Interrogatory 8, what is the name and address of each such doctor who has merely examined you or been consulted by another doctor, his specialty, the date or dates of such examination, and for what specific condition has he examined you?

Answer:    There are none in connection with the allegations in this lawsuit.

10.   As of this time, are you still being treated, examined or attended by any doctor or other practitioner?  If so, for what specific injuries, conditions or complaints is each examining or treating you, and what type of examination, treatment or medication is each giving you?

Answer:    I see Robert Wells for treatment for Post-Traumatic Stress Disorder.

11.   With reference to your past and present employment or occupation or business and education, state:

a.   The names and addresses of all places where you have been employed or engaged in business during the last five years, listing the same in chronological order, commencing with your present employment or business occupation, and indicating after each employment the approximate inclusive period of time from date to date worked there, and the reason for termination;

b.   At each place of employment, state your job classification or position with a brief description of your duties and responsibilities at each such place, whether the employment was continuous or seasonal, the number of hours worked per week;

c.   The name under which you were employed at each such place or the business or firm name which you used while you were engaged in business at each such place;

4

d.   The name under which you were employed at each such place or the business or firm name which you used while you were engaged in business at each such place [*sic*]; and

e.   Detail in chronological order all schools or eductional instutitions you have attended, stating years of attendance, areas of concentration and any degrees earned.

<u>Objection</u>:    Plaintiff objects to this interrogatory because it is unbounded in time and therefore covers plaintiff's entire life; it is, as well, overly broad, unduly burdensome, harassing, and beyond the scope of Rule 26. Without waiving such objections, please see the Answer set forth immediately below.

<u>Answer</u>:    I have not been employed in the past five years, nor have I been a student.

12.   If you have lost any time from work since the alleged incident(s) for any reason, due to injuries received in the incident(s), state the reason and indicate the periods of time lost and the amount of income lost, if any, stating in complete detail how you compute such a loss.

<u>Answer</u>:    None.

13.   During the whole or any portion of time you were unable to work, either full time or part time because of injuries received in the incident:

a.   Did you use any paid sick leave or paid vacation, and if so, how much for how long a period?

b.   Did your employer or his Worker's Compensation carrier pay your salary in whole or in part and for what period of time, by dates, at what rate of pay, the total amount paid, and by what one?

c.   State the name and address of the Worker's Compensation carrier, if paid by it.

d.   Did you collect Unemployment benefits.

<u>Answer</u>:    No (to [a], [b], [d]); none (to [c]).

14.   State the names, address and telephone number of each person who was a witness to the alleged incident(s) and separately identify by name, address and telephone number each person you expect to call as a witness at trial.

<u>Answer</u>:    I deny that any "incident" occurred." Assuming, however, that the interrogatory refers to events which purportedly constituted a crime for which I was arrested and prosecuted, I answer as follows:  Glen Monigle, Phyllis Monigle, Katlyn Monigel, Matthew Monigle, Kevin Regan, Alicia Regan, Robert Regan, Amy Bastarche, Amanda Bastarche, James Bastarche, and all named defendants in this action.

15.    Identfy each person you expect to call as an expert witness at trial, and state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.  Further, identify each expert who has been retained who is not expected to be called as a witness.

<u>Answer</u>:    I have been informed that no determination has been made regarding the identity of expert witnesses to testify at trial.  I will supplement this answer in a timely manner prior to the time of trial.

16.    Please state whether you consumed any drugs or alcholic beverages in the twenty-four hour period preceding the alleged incident(s) and, if so, please state the amount and the type of drug or alcoholic beverage, where you consumed such drug or alcoholic beverage, and at what time you consumed such drug or beverage.

<u>Answer</u>:    I deny that any "incident" occurred." Assuming, however, that the interrogatory refers to events which purportedly constituted a crime for which I was arrested and prosecuted, I answer as follows:  None.

17.    If any person has discoverable knowledge regarding the incident referred to in your complaint, please give:

a.    The name and address of each such person;

b.    The substance of any conversation material to said incident which you had with such person after the alleged incident, including, in your answer, reference to what that person said to you and indicate the date and time during which each such conversation took place.

<u>Answer</u>:    I am unaware of the identities of such persons other than those who are parties to the present action and who are parties to the action in the Commonwelath of Massachusetts entitled *Hilchey v. Monigle, et al.*, (Sup.Ct., Essex Cty.; Civ. No. 05-1543).

18.    Please identify all financial losses you incurred, including but not limited to, medical expenses, lost earnings, and legal expenses and damages to your property, as a result of the incident alleged in your Complaint.

6

Answer:    At the present time, I am aware of the following expenses and financial losses:

| | | |
|---|---|---|
| Legal expenses: | $ | 8,627.80 |
| Moving expenses: | $ | 44,431.34 |
| Loss of equity: | $ | 38,224.90. |

19.  Please state whether either of you have been a plaintiff, claimant, defendant or respondent in connection with any prior claim or complaint for personal injury. If your answer is in the affirmative, for each such prior claim, please state:

    a.  The court and docket number of the complaint;

    b.  The name of the parties involved in the complaint or claim;

    c.  The grounds for each complaint or claim; and

    d.  The disposition of each claim, including monetary or cash awards made by you.

Objection:    Personal injury claims are irrelevant and immaterial to the present action; they are beyond the scope of Rule 26 in that nothing regarding personal injury claims is reasonably calculated to lead to admissible evidence. Without waiving this objection, please see the Answer immediately below.

Answer:    See the Answer to Interrogatory 17.

20.  Please state with specificity each and every fact upon which you base your allegations that the defendant(s) in any way violated your state or federal constitutional and civil rights.

Answer:    I cannot state each and every fact, since they extended over a substantial period of time. In summary, I was arrested and tried for assault with a dangerous weapon, which carries a potential long prison term, all without a reasonable basis in law or fact, when the defendants had actually knowledge that the allegations against me were unfounded and were made with malice.

21.  Please state the date when you were released from police custody, and to whom you were released by as a result of your arrest on September 7, 2002 as alleged in your complaint [sic].

Answer:    I do not understand the Interrogatory in its entirety. I was released on bail approximately three hours after my arrest on September 7, 2002.

22.  Please describe the entire arrest of September 7, 2002.

7

Answer:     Sergeant Arahovites arrested me at my home, in the presence of my family, while I was making dinner in the evening of September 7, 2002. I was handcufffed, taken into custody, brought to the police station, booked, placed in a jail cell, and later released on bail.

23.   Please state with specificity each and every fact upon which you intend to rely upon to support the allegations against the defendant(s) arbitrarily subjected to plaintiff to false accusatory harassment and abuse alleged in plaintiff's amended complaint.

Answer:     I do not understand the Interrogatory in its entirety. I was subjected to false accusations, I was harassed and I did suffer abuse because of the allegations that I was guilty of assault with a dangerous weapon, when I committed no such crime, there was no reasonable basis for any reasonable law enforcement officer to believe that I had comitted such a crime, there was no adequate investigation, and when the trial ended without any finding of guilt.

24.   Please state whether a restraining order was ever taken out against you.

Answer:     To the best of my knowledge, after I was arrested on September 7, 2002, a restraining order issued which effectively prevented me from returning to my home.

25.   What policies and procedures of the Haverhill Police Department were notarized as alleged in the plaintiff's complaint?

Answer:     I do not understand this Interrogatory and therefore I am unable to answer it.

Sworn to under the penalties of perjury this _27th_ day of _November_ 2006.

_Pamela J. Hilchey_
Pamela J. Hilchey

8

**EXHIBIT C**



COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS                                    SUPERIOR COURT
                                             C.A. NO. 05-1543

PAMELA J. HILCHEY,                    )
          Plaintiff                   )
                                      )
                                      )
VS.                                   )
                                      )
PHYLLIS M. MONIGLE, et al.,           )
          Defendants                  )
                                      )

## PLAINTIFF'S ANSWERS TO DEFENDANT'S, PHYLLIS M. MONIGLE, INTERROGATORIES PROPOUNDED TO THE PLAINTIFF

1.  What is your full name, any aliases, date of birth, social security number, residence for last ten years, business and business address for last ten years.

    Answer:    Pamela J. Hilchey, 8/26/58, 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, 4014 Navajo Court, Rock Hill, SC 29732, not employed.

2.  Please state in full detail all the facts on which you base your allegations in Count 1, paragraphs 11 and 12.

    Answer:    The defendants made many defamatory statements about me over the course of several years, and I am not necessarily able to fully describe each one at this time. To the extent that the defendants made defamatory statements about me which are the subject matter of the complaint in this action, I provide the following answer: The defendants made false and defamatory statements about me on September 7, 2002 and on various subsequent dates. The defendants made such false and defamatory statements to officers of the Haverhill Police Department and, I believe, to other individuals, including the other defendants. The defendants falsely represented that I had committed a crime on September 7, 2002, that on that date I committed an assault upon their children and other individuals, that I operated my vehicle in a manner intentionally calculated to endanger the lives of others, that I intended to harm certain individuals and/or to create the apprehension of imminent harm, that their children were witnesses to these alleged acts, and otherwise falsely accused me of committing criminal acts. These statements were made with

reckless and negligent disregard for their truth or falsity and/or
with knowledge that they were false, for the purpose of inducing
legal process to be instituted against me, in order to make use of
such legal process to accomplish an ulterior purpose for which it
was not intended or legitimate, and as threats, intimidation and
coercion against me. Thereafter, the defendants continued to make
such defamatory and false statements in the context of a criminal
prosecution that continued until August 1, 2003 when I was
acquitted. I believe that these defamatory statements were uttered
by telephone, in person and in writing.

3.    Please state in full detail all the facts on which you base your allegations in count
      2, Malicious Prosecution, paragraphs 13 through 16.

      Answer:      See Answer No. 2.

4.    Please state in full detail all the facts on which you base your allegations in
      Count 3, Defamation, paragraphs 17 through 19.

      Answer:      See Answer No. 2.

5.    Please state in full detail all the facts on which you base your allegations in
      Count 4, Abuse of Process, paragraphs 20-23.

      Answer:      See Answer No. 2.

6.    Please state in full detail all the facts on which you base your allegations in
      Count 5, Massachusetts Civil Rights Act, Mass. Gen. Laws, C.12 section 111,
      paragraphs 24 through 25.

      Answer:      See Answer No. 2.

7.    Please identify any written or recorded statements or reports concerning the
      incident, including but not limited to all statements or reports prepared by you,
      any police department, or any other administrative or governmental agency.

      Answer:      I am presently aware of the following non-privileged statements:

                   Criminal Complaints dated 9/9/02 and 9/19/02, Haverhill Police
                   Department reports dated 9/8/02; Haverhill Police Department
                   Booking Sheet dated 9/7/02; Applications for Complaints dated
                   9/7/02 and 9/19/02; Statement of Amanda Bastarche dated 9/7/02;
                   Haverhill Police Department Incident Report dated 9/7/02;
                   Haverhill Police Department Report of Office Melanson dated
                   9/7/02; Statement of Katelyn Monigle dated 9/7/02; Statement of
                   Matthew Monigle of 7/11/02 (sic); statement of Kevin Regan of

9/10/02; Supplemental Report of Det. George Dekeon, Jr. of
9/7/02; Victim Impact Statements of Phyllis and Glen Monigle,
Victim Impact Statement of Robert W. Regan and Alicia K.
Regan.

8.      Please provide a detailed description of the incident which forms the bases of
        your complaint.

        Answer:     See Answer No. 2.  All statements of the defendants were
                    categorically false.

9.      Give an itemized statement to date of all monetary losses incurred by you as result
        of this occurrence.

        Answer:     At the present time, I am aware of the following expenses and
                    financial losses:

                    Legal expenses:     $ 8,627.80
                    Moving expenses:    $44,431.34
                    Loss of equity:     $38,224.90

10.     Please state if anyone has issued any police complaints against you while you
        were residing at any of your previous residential addresses prior to this
        incident/litigation and/or subsequent, and provide:

        a.      the dates, nature of allegation and Police Station.
        b.      The names and addresses of the individuals who sought out a complaint
                against you.
        c.      Disposition of the above.

        Answer:     a. – c.  Assuming "police complaints" refers to criminal
                    complaints, none.

11.     Please state if you initiated any complaints, nuisance or otherwise, against any of
        your former neighbors prior to this incident/litigation and/or subsequent to and
        provide:
        a.      the names and addresses of the individuals who were the subject of the
                complaint.
        b.      Disposition of the above.

        Answer:     a. – b.  Assuming "complaints" refers to criminal complaints,
                    none.

12.     Identify each particular statement, date, made by the defendants which you claim
        were intended to induce police to seek written complaints against you.

Answer:          See Answer No. 2.

13.   Identify each particular statement, date, made by the defendants which you claim
      were made with malice, negligence or reckless disregard for the truth of such
      statements or which you claim constituted a threat, intimidation and/or coercion.
      Please also identify any witnesses to these statements and any effects that you
      claim suffered as a result individually and/or in the community.

      Answer:          See Answer No. 2.

14.   Please describe the nature of your relationship with the defendants prior to the
      incident/litigation.

      Answer:          We were neighbors.

15.   Please provide the name and address of each witness, including parties, known to
      you to have seen the incident or heard or known about the incident indicating the
      exact location of each such witness at the time he or she saw the incident or, if
      such witness did not actually see the incident happen, where and when such
      witness heard or learned about the incident.

      Answer:          Because there was no "incident" there were no witnesses.

16.   Please state the name and address or current whereabouts of every person either
      known to you or believed by you to have knowledge of any matter relevant to the
      subject matter of this action.

      Objection:       Plaintiff objects to this interrogatory on the grounds that it is
                       overly broad, unduly vague, and exceeds the scope of discovery
                       permitted by Rules 26 and 33 of the Massachusetts Rules of Civil
                       Procedure.  Without waiving this objection, the plaintiff answers as
                       follows:

      Answer:          The defendants have knowledge of the facts concerning the subject
                       matter of this action, as do Katelyn Monigle, Matthew Monigle,
                       Kevin Regand and Amanda Bastarche.  My former husband,
                       Ronald Hilchey, and my daughter, Lindsay Hilchey, also have such
                       knowledge.  Members of the Haverhill Police Department also
                       have such knowledge.

17.   Please state the name, home address, and business address of every person whom
      you or your attorney intend to call as an expert witness at the trial of this action.

      Answer:          I have been informed that no determination has been made
                       regarding the identity of expert witnesses to testify at trial.  I will

supplement this answer in a timely manner prior to the time of trial.

18.  State the name and present or last known address of persons from whom written statements have been obtained in your behalf, either before or after the commencement of suit concerning the facts alleged in the pleadings and the subject of this action.

  a.  the date each such statement was taken;
  b.  the contents of each such written statement
  c.  the name and present or last known address of the person who took each such written statement;
  d.  the name, and present or last known address of persons in physical possession of each written statement and all copies thereof.

  Answer:  The plaintiff objects to this interrogatory on the grounds that it seeks discovery of material which, if it exists, is protected from discovery as attorney work product, was created in anticipation in litigation and in preparation for trial, and is otherwise privileged.

19.  Please state, with respect to each such expert:

  a.  The subject matter on which each is expected to testify.
  b.  The substance of the facts and opinions to which each is expected to testify.
  c.  A summary of the grounds for each such opinion.

  Answer:  See Answer No. 17.

20  If you claim injuries, emotional, physical or otherwise, as a result of the alleged incident, pleas give:

  a.  A complete description of the injuries that you received, indicating those which you believe to be permanent.

  b.  The names and addresses of all doctors, medical/health care providers, who treated you, giving a complete description of the treatment that you received, and indicating the dates on which you received said treatment.

  c.  The dates on which you were confined to bed and/or home as a result of the alleged incident.

  d.  The dates between which you were absent from work and/or school.

  e.  The wages, salary, or business profits that you were receiving at the time of the alleged accident.

f.   The name and address of your employer and/or the name and address of the school that you were attending when injured.

Answer:   I suffered severe emotional anguish and depression, which has not alleviated.

21.   Please describe in complete detail any illnesses, ailments, injuries, diseases, physical impairments, disability or surgical procedures which you have had, suffered from, or undergone:

a.   Within ten (10) years prior to the date of this alleged accident, stating the dates for each and the names and addresses of all; providers whom you treated with and whether you were on any medication at the time of the alleged incident.

b.   Subsequent to the date of this alleged accident, not caused by or arising from the same, stating the dates for each and the names and address of all; providers whom you treated with.

Answer:   Plaintiff objects to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, and otherwise exceeds the scope of discovery permitted by Rules 26 and 33 of the Massachusetts Rules of Civil Procedure.

22.   Please state whether you may have been convicted of any felonies in the last ten years or any misdemeanors in the last 5 years, stating date and nature of offense, court / docket number, and manner of disposition/date.

Answer:   None.

Signed under the penalties of perjury this 7th day of June, 2006.

_Pamela Hilchey_
Pamela J. Hilchey

**EXHIBIT D**

Haverhill Police Supplement Report

Date: September 8, 2002

Re: Arrest of Pamela Hilchey

On September 7, 2002 Officer Melanson and Sgt. Pellot went to 49 Pear tree lane on an assault complaint. After speaking with the victims and their parents Melanson was advised by Sgt. Pellot to go to the police station and apply for a complaint to summons Pamela Hilchey to court. Melanson did the appropriate paperwork and applied for the summons.

A short while later ,Sgt. Pellot had a conversation with Captain Ratte, the Patrol Commander and Lt. Dorr, the shift commander. Acting Chief Parolisi was also notified. After speaking with his superiors, Sgt. Pellot called Melanson back to the station and informed him that he wanted Melanson to get together with Detectives Dawkins and Dekeon and re interview the victims at the police station and take statements from them. Sgt. Pellot advised Melanson to take the statements from the victims and leave them for the Officer in Charge, Lt. Leeman and he, Lt. Leeman would call the Clerk Magistrate to view the statements, and if necessary issue a complaint for the defendant.

The Clerk Magistrate issued a warrant for Pamela Hilchey's arrest. Sgt. Arahovites went to Pamela Hilchey's house and arrested her. She was brought to the station to Lt. Leeman who advised her of her rights and charges. She was booked, placed in a cell then bailed out.

Note: Det. Dekeon informed Lt. Leeman that there may possible be another victim that was involved with this case.

Melanson
3/28/67
Exhibit No. 6
R. Picariello

**EXHIBIT E**

**PART 1**

14

1          MR. MILLER:  Any bus stop.

2          MR. GOWEN:  Marked or --

3          MR. MILLER:  I asked him about any bus

4     stop.  And clearly I've shown him the map of Route

5     51, I had that in mind as well as any school bus

6     stop.  Frequently they are marked.  I'm just

7     asking and the witness has said he doesn't know of

8     any.

9     BY MR. MILLER:

10  Q.  Would it surprise you, Detective Melanson, if

11      Sergeant Pellot said that you told him on

12      September 7th that some kids had been scared at a

13      bus stop by Pam Hilchey?

14          MS. GELLER:  Objection.

15  Q.  Do you recall telling him that?

16  A.  I don't recall telling him that.  But --

17  Q.  Do you recall having a conversation with Sergeant

18      Pellot on September 7th?

19  A.  Yes.

20  Q.  And when was the first conversation you had on

21      September 7th with Sergeant Pellot?

22  A.  I was at the house taking the report from the

23      victims.

24  Q.  Had you called Sergeant Pellot prior to that time

26

1    where the, at that point the suspect and then the

2    defendant, Pam Hilchey did what she did with

3    respect to the children that was the subject of

4    the complaint?

5             MS. GILGUN RYAN:  Objection.  You can

6    answer.

7  A.  On this picture, no.  It's kind of hard to --

8  Q.  Okay.

9  A.  I was in the house speaking to them.

10  Q.  Yes.

11  A.  You know what I mean, I was in the victim's house

12    talking to them.

13  Q.  Okay.  So you were in the victim's house, you

14    spoke with them.  They didn't point to a location,

15    an exact location where this occurred?

16             MS. GELLER:  Objection.

17  A.  I think they had said where it occurred, I think

18    they said up by the bus stop.  I'd have to read

19    the report about being sent up.

20  Q.  Okay.

21  A.  As far as me looking when I was taking the report,

22    no.

23  Q.  Okay.  And you've testified earlier that you're

24    not really aware if there's any bus stop around

1          their parents, take the statements and go back and

2          apply for the complaint.

3    Q.    Okay.  And when did he say that to you?

4    A.    At the station -- at the house.

5    Q.    Do you know whether Sergeant Pellot at the house

6          made a report to the officer in charge regarding

7          that call to Pear Tree Road?

8    A.    Did he make a report?

9    Q.    No, did --

10   A.    I don't know.

11   Q.    Did he make a phone call?

12   A.    I don't recall.

13   Q.    Or a radio transmission?

14   A.    I don't recall.

15   Q.    So Sergeant Pellot said, make out a criminal

16         complaint; is that correct?

17   A.    Correct.

18   Q.    And so you did that, you went back and you were

19         doing the paperwork and you're going to apply for

20         the criminal complaint?

21   A.    Yes.

22   Q.    The next paragraph, it says, a short while later.

23         About how long later, if you recall today?

24   A.    I don't recall how long that was.  He spoke to

56

1   Q.   Yes.

2   A.   I have no idea.

3   Q.   About how long is a typical investigation?

4            MS. GILGUN RYAN:  Objection.

5   A.   There is no typical investigation.

6   Q.   Did you have any training at the police academy or

7        at any time afterwards about investigating

8        felonies?

9   A.   Yeah, we had basic training for that at the

10       academy.

11  Q.   Did that include investigating charges of assault?

12  A.   Yes.

13  Q.   And do you recall what it was that you were

14       recommended to do during that training?

15  A.   Yeah, get all the facts straight.  And if you have

16       all the elements of the crime, to take the proper

17       steps.

18  Q.   What do the facts include?

19           MS. GELLER:  Objection.

20           MR. MILLER:  The witness has just

21       testified to get the facts straight and I'm

22       asking --

23           MS. GELLER:  About a particular incident

24       what the facts are?

59

1  A.   Like you said, with a gun, sending a gun out, see

2       if it's shooting, if it can be shot.  I've

3       collected bats, sticks, knives, in terms of

4       talking about physical evidence, yeah.

5  Q.   Did you do any physical investigation with respect

6       to Pam Hilchey?

7  A.   No.

8            MS. GILGUN RYAN:  Objection.

9  Q.   Why?

10 A.   Because there wasn't -- I didn't think it was

11      necessary.

12 Q.   What in your mind made it unnecessary?

13 A.   Speaking to the victims, I put that together and

14      that was it.  What they told me, I felt that I had

15      enough to apply for the complaint.

16 Q.   So you spoke with Phyllis Monigle, as you said in

17      the exhibit that outlines your testimony.

18 A.   (Witness nods head).

19 Q.   And then you confirmed it with the kids?

20 A.   Correct.

21           MS. GILGUN RYAN:  Objection.

22           MS. GELLER:  Objection.

23 Q.   And that was sufficient as far as you were

24      concerned?

60

1   A.   Yes.

2   Q.   About how long did the initial interview with Mrs.

3        Monigle and the children last?

4               MS. GILGUN RYAN:   Objection.   You can

5        answer.

6   A.   I don't recall.   I'd have to look.   I don't recall

7        that.

8   Q.   Was it more than an hour?

9   A.   No.

10  Q.   Less than half an hour?

11              MS. GILGUN RYAN:   Objection.   You can

12       answer if you know.

13  A.   Yes, I'd say less than half an hour.   I don't know

14       how long.

15  Q.   Did you speak with the suspect prior to going and

16       applying for the complaint?

17  A.   No.

18  Q.   Why not.

19  A.   I don't know.   I don't know if she was around.   I

20       don't know.   I don't know.

21  Q.   Do you know where she lived?

22  A.   Yes.

23  Q.   Did you knock on the door?

24  A.   No.

67

1    A.    On when he took it, yes.

2    Q.    Is that what Amanda Bastarache said at 49 Pear

3          Tree Road when you visited there earlier that day?

4    A.    I'd have to see that to compare it.

5    Q.    Take a look at Exhibit 10 which was previously

6          marked as Dekeon 1.

7                     (Exhibit No. 10 marked for

8                     identification)

9          BY MR. MILLER:

10   Q.    Have you had an opportunity --

11   A.    Yes.

12   Q.    -- to review Exhibit 10?

13   A.    Mm-hmm.

14   Q.    Okay.  After having reviewed Exhibit 10, do you

15         recall speaking with Amanda on the morning of

16         September 7th?

17   A.    Yes.

18   Q.    And do you recall what she said?

19   A.    Yes.  She confirmed the same story that the mother

20         had -- the reporting party had told me.

21   Q.    Okay.  Could you take a look, Detective, at

22         Exhibit 2.  That's the map.

23   A.    Oh, I'm sorry.

24   Q.    That's the MapQuest map.  Can you tell me where

68

```
 1         the end of the development is there?
 2   A.    The end of the development?
 3   Q.    Yes.
 4   A.    Pear Tree?
 5   Q.    Yes.
 6   A.    Right down here (indicating).
 7   Q.    I'm going to give you a pen and I'd like you to
 8         circle the end of the development and initial it,
 9         if you would.
10   A.    (Witness complies).
11   Q.    Okay.
12                 MR. MILLER:  The witness has circled that
13         portion.
14   Q.    Is it Russett Hill Road there?
15   A.    That's the end of the development, yes.
16   Q.    Yes.
17   A.    That's one of the development.
18   Q.    Do you know where the other end is?
19   A.    It looks up here (indicating).  I'd say, that's
20         the beginning (indicating), and that's the end of
21         it (indicating).
22   Q.    Could you circle the other part?
23   A.    Right here (indicating).  (Witness complies).
24   Q.    So those are the ends?
```

69

```
 1   A.   Correct.

 2   Q.   If you take a look at the second page of Exhibit

 3        10, there's a narrative there, R stated V1, V2, V3

 4        reported the following at about 9:10.  V1, V2, V3

 5        went riding their bicycles in the neighborhood,

 6        they were at the end of the development and S

 7        drove towards them.  Can you show me now with an X

 8        where you're referring on this subject when you

 9        wrote in Melanson Exhibit 10 that they were at the

10        end of the development?

11   A.   No, I have no idea.

12   Q.   So you --

13   A.   I just went by what they said.

14   Q.   So you don't know which end it was?

15   A.   Correct.

16   Q.   But it was some end?

17   A.   Correct.

18   Q.   The V's got scared and had to move out of the way.

19        The suspect left of the area and came back and the

20        V saw her drive into her driveway.

21                  So this is the statement that you

22        took from Phyllis Monigle; is that correct?

23   A.   Correct.  And the kids confirmed it, the victims.

24   Q.   And this report here, does this report here
```

95

1   A.   I don't know.  I had nothing to do with that one.

2   Q.   Now, reporting, it says here, I talked to S and he

3        stated that he did not make any threats of any

4        kind.  So the officer here spoke with the suspect;

5        is that correct?

6   A.   Correct.

7   Q.   In an ongoing neighborhood dispute?

8              MS. GILGUN RYAN:  Objection.

9   Q.   Is that correct?

10  A.   That's correct.

11  Q.   And there are accusations going back and forth; is

12       that correct?

13  A.   Yes.

14  Q.   And you didn't speak with Mrs. Hilchey; is that

15       correct?

16  A.   Correct.

17  Q.   And it's on the basis of testimony of three

18       witnesses, each of whom is under ten; is that

19       correct?

20  A.   The basis is -- basically the basis is this why I

21       didn't talk -- all the problems that they've been

22       having, the department realized that it's got to

23       be dealt with, that's why basically.  By the time

24       I got to it, that thing, all this stuff had

96

1    happened.  I'm sure everything was -- it was time

2    to do something.

3 Q.  And just for reference, the first incident report

4    here is dated in 1995 and then you go up --

5 A.  Mm-hmm.

6 Q.  -- and there's one dated in 2002 -- 2001, excuse

7    me.  There is one dated October 5th, 2001 there

8    are three separate reports in here.  So, there is

9    a history of incident reports here.  And what you

10   just testified to is, we knew we had to do

11   something at the police department because of what

12   was going on here?

13 A.  Correct.

14              MS. GILGUN RYAN:  Objection.  You can

15   answer.

16 Q.  Do you know, and forgive me if I asked this, do

17   you know why it is that you were asked to get

18   additional statements after making out your

19   initial incident report?

20              MS. GILGUN RYAN:  Objection.

21 A.  I'm sure they wanted to make sure everything

22   was -- 'cause we're dealing with a police

23   officer's wife --

24 Q.  Yes.

97

1    A.    -- make sure everything was -- get as much facts

2          as we could before we, you know, put the complaint

3          in.

4    Q.    Okay.  But you were going to put the complaint in

5          before you got the statements in the afternoon?

6                    MS. GILGUN RYAN:  Objection.

7    A.    I was --

8                    MS. GILGUN RYAN:  You can answer.

9    A.    I was just going by what they had told me.

10   Q.    Okay.  Fair enough.

11                   MR. MILLER:  This will be Exhibit 12.

12                   (Exhibit No. 12 marked for

13                   identification)

14         BY MR. MILLER:

15   Q.    When you've reviewed Exhibit 12, Detective, please

16         let me know.

17   A.    Yeah.

18   Q.    Is that your signature?

19   A.    Yes, it is.

20   Q.    That's your badge number?

21   A.    Yes.

22   Q.    This is the application for a complaint you made;

23         is that correct?

24   A.    Correct.

118

1  A.  As long as I've been on the department.

2  Q.  Okay.  And how long have you been on the

3      department, again?  I apologize.

4  A.  Nineteen years.

5  Q.  Thank you, sir.  In interviewing the children, did

6      you find them to be credible at that time?

7  A.  Yes, I did.

8  Q.  And you would agree with me that in interviewing

9      children, it's sometimes different than

10      interviewing adults?

11  A.  Yes.

12  Q.  And you as an officer or an investigating officer

13      who's experienced understands the precautions that

14      one has to take in interviewing children as well

15      as adults in trying to piece together an

16      investigation that's being undertaken?

17  A.  Yes.

18  Q.  And as a result of that investigation and that

19      initial meeting with the children, you found them

20      to be credible; is that correct?

21  A.  Yes, I did.

22  Q.  Did you find any of those three children that you

23      interviewed not to be credible?

24  A.  No.

120

```
 1        that section of the general laws refers to

 2        assault.

 3                MR. GOWEN:   Okay.

 4     BY MR. GOWEN:

 5  Q.   In regards to the charges brought against Ms.

 6        Pamela Hilchey, officer, or detective, whatever

 7        they may have been in this particular case, if the

 8        interviews conducted with the children did not

 9        contain the necessary elements of the charges in

10        which Mrs. Hilchey was brought, would you have

11        still brought forward an application for a

12        complaint?

13  A.   No.

14                MR. GOWEN:   Thank you.   That's all I

15        have.

16                REDIRECT EXAMINATION

17     BY MR. MILLER:

18  Q.   I've got just a couple of follow-ups.   On the

19        basis of what did you determine that those

20        children were credible?

21  A.   I spoke to the parent first, she told me and then

22        the kids said the same thing.   They were scared.

23        That's it.

24  Q.   Have you had any experience with interviewing
```

EXHIBIT E

PART 2





# MAPQUEST.

100 Elliott St
Haverhill MA
01830-2306 US

**Notes:**





All rights reserved. Use Subject to License/Copyright

This map is informational only. No representation is made or warranty given as to its content. User assumes all
risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

Page 1 of 1

Map of 61 Pear Tree Rd Haverhill, MA by MapQuest

★ **61 Pear Tree Rd**
Haverhill, MA 01830-2339, US



All rights reserved. Use Subject to License/Copyright
This map is informational only. No representation is made or warranty given as to its content. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

**HAVERHILL POLICE DEPARTMENT INCIDENT REPORT**

| Crime | | | | |
|---|---|---|---|---|
| Domestic Violence | Y ☐ N ☒ | | | |

| Date & Time of Report | mo. 06 | day 19 | yr. 00 | time 21:10 |
|---|---|---|---|---|

CASE # 6168

ACTIVITY # 18531

INCIDENT: Threats,   LOCATION: 1 Cortland Rd.

**TIME OF OCCURENCE**

TYPE OF PREMISE: 03

| FROM | | | | TO | | | | CLASS CODE | PRIOR VICTIMIZATION | |
|---|---|---|---|---|---|---|---|---|---|---|
| MO. 06 | DAY 13 | YR. 00 | TIME 2038 | MO. 06 | DAY 13 | YR. 00 | TIME 2038 | 146B | YES   (NO) | DATE: |

INVL CODE: M - Missing   O - Owner   R - Reporting   V - Victim   W - Witness   Y - Other

| CODE | NAME | SEX | ADDRESS | RACE | DOB | PHONE | SS# |
|---|---|---|---|---|---|---|---|
| V 1 | Hilchey Pamala J | F | 1 Cortland Rd Haverhill MA | CU | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |

**SUSPECT 1:**
LAST:   FIRST:   MIDDLE:   GEN:   AKA:

SUSPECT 1 ADDRESS:

RESIDENCE PHONE:   OTHER PHONE:   OCCUPATION:

| RACE: | SEX: | DOB: | HT: | WT: | HAIR: | EYES: | DL NUMBER: | STATE: | CLASS: | HAZARD Y/N |
|---|---|---|---|---|---|---|---|---|---|---|

DISPOSITION: (CIRCLE ONE) 1 - ARRESTED/BOOKED   2 - ARRESTED/RELEASED   3 - ARRESTED/CITED/RELEASED   4 - NOT ARRESTED   5 - COMPLAINT APP.   RIGHTS WARNING: DATE   TIME

MISC INFORMATION:

**SUSPECT 2:**
LAST:   FIRST:   MIDDLE:   GEN:   AKA:

SUSPECT 2 ADDRESS:

RESIDENCE PHONE:   OTHER PHONE:   OCCUPATION:

| RACE: | SEX: | DOB: | HT: | WT: | HAIR: | EYES: | DL NUMBER: | STATE: | CLASS: | HAZARD Y/N |
|---|---|---|---|---|---|---|---|---|---|---|

DISPOSITION: (CIRCLE ONE) 1 - ARRESTED/BOOKED   2 - ARRESTED/RELEASED   3 - ARRESTED/CITED/RELEASED   4 - NOT ARRESTED   5 - COMPLAINT APP.   RIGHTS WARNING: DATE   TIME

MISC INFORMATION:

HAIR LENGTH CODES | HAIR STYLE CODES | FACIAL HAIR CODES | COMPLEXION CODES | APPEARANCE CODES | DEMEANOR CODES | SPEECH CODES | WEAPON

SUSPECT #1 (CIRCLE ONE)   TATTOO  MO-MOLE  TH-TEETH  SC-SCAR  GL-GLASSES  OT-OTHER

SUSPECT #2 (CIRCLE ONE)   TT-TATOO  MO-MOLE  TH-TEETH  SC-SCAR  GL-GLASSES  OT-OTHER

| REPORTING OFFICER SIGNATURE | ID# 68 | DATE OF REPORT 06-19-00 | SUPERVISOR'S APPROVAL/SIGNATURE | DATE 6/19/00 |
|---|---|---|---|---|
| ☐ INFORMATION ONLY  ☐ JUVENILE | | DATA ENTRY CLERK NAME | | DATE ENTERED INTO SYSTEM |
| ☐ PATROL FOLLOW UP  ☐ SUBMIT FOR JUDICIAL ACTION | | | | |
| ☐ DETECTIVES  ☐ OTHER | | | | |

MELANSON EXHIBIT 4

AVAILABLE INVOLVEMENT CODES— P-SUSPICIOUS  H-DAMAGED  A-ABANDONED  I-IMPOUNDED  U-INVOLVED IN INCIDENT  Q-SUSPECT

**VEHICLES**

| CODE | LICENSE NUMBER | LIC. STATE | TYPE* | LICENSE (MO/YR) | MAKE | MODEL | STYLE | YEAR | PRIMARY COLOR | SECOND COLOR |
|------|----------------|------------|-------|------------------|------|-------|-------|------|----------------|---------------|
| | | | | | | | | | | |
| | | | | | | | | | | |

*VEHICLE TYPES— A-PASSENGER AUTO    B-VAN OR PICKUP TRUCK    C-TRUCK    D-MOTORCYCLE    E-OTHER

**PROPERTY**

PROPERTY TYPE CODES — M-MISCELLANEOUS  B-BICYCLES  D-DRUGS  C-CHECKS

| TYPE CODES | DESCRIPTION (COMMON NAME) | INV CD | ITEM | MANUFACTURER | MODEL NUMBER | SERIAL NUMBER | VALUE | QUANTITY |
|------------|---------------------------|--------|------|--------------|--------------|----------------|-------|----------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

*PROPERTY INVOLVEMENT CODES: C-CONFISCATED  D-DAMAGED  E-EVIDENCE  F-FOUND  K-SAFEKEEPING  L-LOST  R-RECOVERED  S-STOLEN  X-OTHER

**M.O./SOLVABILITY**

EVIDENCE OBTAINED CODES: 1 □ Prints   2 □ Weapon/Tools   3 □ Vehicle   4 □ Photos   5 □ Hair   6 □ Stains   7 □ Blood/Semen/Body Fluids   8 □ None   9 □ Other

| | | |
|---|---|---|
| Was a suspect arrested? | Was there a witness to the crime? | Are all elements of crime present? |
| Can a suspect be named? | Is there a significant M.O. present? | Was major injury or rape involved? |
| Can a suspect be described? | Is stolen property traceable? | Can suspect be identified? |
| Can a suspect be described? | Is there significant physical evidence? | Can suspect vehicle be identified? |
| Is there significant reason to believe the crime may be solved? | | |

**NARRATIVE**

1. (V) states that (S) had parked his mv in front of (V) house and (V)
2. went and parked her mv in front of (S) house. (V) then walked back to
3. her house and threw some dirt into the street that was on her steps.
4. and (S) looked out (V) and (V) then stated you got a problem and (S)
5. then made a statement that he was going to hurt (V) and (V's)
6. daughter. I talked to (S) and he stated that he did not make any
7. threats of any kind.
8.
9.
10.
11.
12.

VICTIM-REPORTING PARTY SIGNATURE   X _Pamela Welch_

CASE STATUS    O - OPEN    C - CLOSED    U - UNFOUNDED    (CIRCLE ONE)

9

Crime Y N

Domestic Violence  Y ☐ N ☐

**HAVERHILL**
**POLICE DEPARTMENT**
**INCIDENT REPORT**

| Date & Time of Report | mo. | day | yr. | time |
|---|---|---|---|---|
| | 10 | 05 | 2001 | 17¹⁷ |

CASE # 01010611

ACTIVITY # 01031988

INCIDENT _Threat_        LOCATION 1 Cortland Rd

TYPE OF PREMISE

TIME OF OCCURENCE

| FROM | | | | TO | | | | CLASS CODE | PRIOR VICTIMIZATION | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MO. | DAY | YR. | TIME | MO. | DAY | YR. | TIME | | YES | NO | DATE: |
| 10 | 05 | 2001 | 1530 | | | | | 146B | | | |

INVL CODE:

M - Missing   O - Owner   R - Reporting   V - Victim   W - Witness   Y - Other

| CODE | NAME | SEX | ADDRESS | RACE | DOB | PHONE | SS# |
|---|---|---|---|---|---|---|---|
| V 1 | Hilchey Pam J | | 1 Cortland Rd Haverhill | W | | W- | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |

SUSPECT 1:

LAST:        FIRST:        MIDDLE:        GEN:        AKA:

SUSPECT 1 ADDRESS:

RESIDENCE PHONE:        OTHER PHONE:        OCCUPATION:

RACE:   SEX:   DOB:   HT:   WT:   HAIR:   EYES:   DL NUMBER:   STATE:   CLASS:   HAZARD Y/N

DISPOSITION: (CIRCLE ONE)
1 - ARRESTED/BOOKED    2 - ARRESTED/RELEASED    3 - ARRESTED/CITED/RELEASED    4 - NOT ARRESTED    5 - COMPLAINT APP.    RIGHTS WARNING: DATE    TIME

MISC INFORMATION:

SUSPECT 2:

LAST:        FIRST:        MIDDLE:        GEN:        AKA:

SUSPECT 2 ADDRESS:

RESIDENCE PHONE:        OTHER PHONE:        OCCUPATION:

RACE:   SEX:   DOB:   HT:   WT:   HAIR:   EYES:   DL NUMBER:   STATE:   CLASS:   HAZARD Y/N

DISPOSITION: (CIRCLE ONE)
1 - ARRESTED/BOOKED    2 - ARRESTED/RELEASED    3 - ARRESTED/CITED/RELEASED    4 - NOT ARRESTED    5 - COMPLAINT APP.    RIGHTS WARNING: DATE    TIME

MISC INFORMATION:

| HAIR LENGTH CODES | HAIR STYLE CODES | FACIAL HAIR CODES | COMPLEXION CODES | APPEARANCE CODES | DEMEANOR CODES | SPEECH CODES | WEAPON |
|---|---|---|---|---|---|---|---|
| 1 2 SUSPECT | 1 2 Suspect | 1 2 SUSPECT | 1 2 SUSPECT | 1 2 SUSPECT | 1 2 SUSPECT | 1 2 SUSPECT | 1 2 SUSPECT |

HAIR LENGTH CODES:
01 Unknown
02 Long
03 Short
04 Waist
05 Shoulder
06 Collar
07 Bald
08 Thinning
09 Medium
10 Other

HAIR TYPE CODES:
Bald
Coarse
Curly
Fine
Straight
Thick
Thinning
Wavy
Wiry
Other
Unknown

HAIR STYLE CODES:
AF Afro
BL Bald
BR Braided
BU Bushy
CU Curly
FT Flat Top
GR Greasy
ML Military
MO Mohawk
OT Other
PK Punk
PO Processed
PT Ponytail
RC Receding
ST Straight
UK Unknown
WI Wig

FACIAL HAIR CODES:
CS Clean Shaven
FB Full Beard
FU Fu Manchu
FZ Fuzz
GO Goatee
HA Handlebar Mustache
LL Lower Lip
MU Mustache
NB No-Brow (No-Eye Brow)
NO None
OB One-Brow (Continous Brow)
SI Sideburns (Long or Nonordinary)
ST Stubble
UK Unknown
VD Van Dyke

COMPLEXION CODES:
AC Acne
AL Albino
BL Black
BR Brown
FA Fair
FR Freckled
ME Medium
PA Pale
RU Ruddy
TA Tanned
UK Unknown
YE Yellow

APPEARANCE CODES:
01 Unknown
02 Conservative
03 Dirty
04 Disguised
05 Flashy
06 Military
07 Wet
Groomed
Cocky
Casual
Disorderly/ Sloppy
10 Other

DEMEANOR CODES:
01 Cooperative
02 Uncooperative
03 Talkative
04 Excited
05 Sleepy
06 Combative
07 Indifferent
08 Insulting
09 Cocky
10 Carefree
11 Polite
12 Irrational
13 Professional
14 Intoxicated
15 Stupor
16 Unconscious
17 Disorganized
18 Calm
19 Angry
20 Apologetic
21 Other

SPEECH CODES:
AC Accented
LP Lisps
MT Mute
MU Mumbles
NA Nasal
NE Non-English Speaking
OT Other
RA Rapid
SL Slow
SS Slurred Speech
ST Stutters
TK Talkative
UK Unknown
UN Uneducated

WEAPON:
01 Unknown
02 Handgun
03 Shotgun
04 Rifle
05 Sim Gun
06 Toy Gun
07 Knife
08 Oth Cutting
09 Hands/Feet
10 Club
11 Auto
12 Other

SUSPECT #1 (CIRCLE ONE)
TA-TATOO   MO-MOLE   TH-TEETH   SC-SCAR   GL-GLASSES   OT-OTHER

SUSPECT #2 (CIRCLE ONE)
TT-TATOO   MO-MOLE   TH-TEETH   SC-SCAR   GL-GLASSES   OT-OTHER

| REPORTING OFFICER SIGNATURE | ID# | DATE OF REPORT | SUPERVISOR'S APPROVAL - SIGNATURE | DATE |
|---|---|---|---|---|
| Sgt. John Roy | 9924 | 10-05-2001 | Lt Wm Jerma | 10/5/01 |

☐ INFORMATION ONLY   ☐ JUVENILE
☐ PATROL FOLLOW UP   ☐ SUBMIT FOR JUDICIAL ACTION
☐ DETECTIVES   ☐ OTHER

DATA ENTRY CLERK NAME   Kathy

DATE ENTERED INTO SYSTEM  10/9/01

14

**AVAILABLE INVOLVEMENT CODES— P-SUSPICIOUS  H-DAMAGED  A-ABANDONED  I-IMPOUNDED  U-INVOLVED IN INCIDENT  Q-SUSPECT**

| CODE | LICENSE NUMBER | LIC. STATE | TYPE* | LICENSE (MO/YR) | MAKE | MODEL | STYLE | YEAR | PRIMARY COLOR | SECOND COLOR |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

**\*VEHICLE TYPES— A-PASSENGER AUTO      B-VAN OR PICKUP TRUCK      C-TRUCK      D-MOTORCYCLE      E-OTHER**

**PROPERTY TYPE CODES — M-MISCELLANEOUS  B-BICYCLES  D-DRUGS  C-CHECKS**

| TYPE CODES | DESCRIPTION (COMMON NAME) | INV CD | ITEM | MANUFACTURER | MODEL NUMBER | SERIAL NUMBER | VALUE | QUANTITY |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**\*PROPERTY INVOLVEMENT: C-CONFISCATED  D-DAMAGED  E-EVIDENCE  F-FOUND  K-SAFEKEEPING  L-LOST  R-RECOVERED  S-STOLEN  X-OTHER**

### EVIDENCE OBTAINED CODES

1 □ Prints    4 □ Photos    7 □ Blood/Semen/Body Fluids
2 □ Weapon/Tools    5 □ Hair    8 □ None
3 □ Vehicle    6 □ Stains    9 □ Other

| Was a suspect arrested? | Was there a witness to the crime? | Are all elements of crime present? |
|---|---|---|
| Can a suspect be named? | Is there a significant M.O. present? | Was major injury or rape involved? |
| Can a suspect be located? | Is stolen property traceable? | Can suspect be identified? |
| Can a suspect be described? | Is there significant physical evidence? | Can suspect vehicle be identified? |
| Is there significant reason to believe the crime may be solved? | | |

### NARRATIVE

1. V- states she was driving her vehicle down Pear Tree Rd
2. To pick up her daughter at the bus stop. V- states S wife
3. was parked in the roadway left of way. V- said she stopped her
4. M/V and S wife acted as if V was going to hit her so she
5. pulled off the roadway had to the right. V- states she was at
6. the bus stop when the S pulled up behind her as he pulled up
7. V thought he was going to hit her vehicle. Then S moved
8. up beside V and started yelling at her through his window.
9. V- states S told her she better stay away from his wife
10. They were all out to get her and they were going
11. To get her good.
12.

VICTIM-REPORTING PARTY SIGNATURE  X _____

| CASE STATUS | O - OPEN | C - CLOSED | U - UNFOUNDED | (CIRCLE ONE) |
|---|---|---|---|---|

**EXHIBIT F**

1

1                                      Volume: I
                                       Pages: 1 to 118
2                                      Exhibits: 1 to 9

3

                    COMMONWEALTH OF MASSACHUSETTS
4      Essex, ss.              Trial Court of the Commonwealth
                               Superior Court Department
5                              Civil Action No. 051543

6

       PAMELA J. HILCHEY                    )
7           Plaintiff,                      )
                                            )
8      v.                                   )
                                            )
9      PHYLLIS M. MONIGLE, GLEN E.          )
       MONIGLE, AMY BASTARACHE,             )
10     JAMES BASTARACHE, ROBERT W.          )
       REGAN, and ALICIA K. REGAN           )
11          Defendants.                     )

12

13          DEPOSITION of PHYLLIS MONIGLE, a witness

14     called on behalf of the Plaintiff, taken pursuant

15     to the Massachusetts Rules of Civil Procedure,

16     before Robin Picariello, Registered Merit Reporter

17     and Notary Public, at the Offices of Weston,

18     Patrick, Willard & Redding, P.A., 84 State Street,

19     Boston, Massachusetts on November 13, 2006

20     commencing at 10:10 a.m..

21

22

                            R.P. REPORTING
23                          63 East Street
                    Pepperell, Massachusetts 01463
24                          (978) 433-8285

68

1         had said was true; correct?

2    A.    Correct.

3    Q.    You never asked her before you called the police

4         whether she had tried to hit any of the children

5         with her car; correct?

6    A.    Correct.

7    Q.    And you never asked her afterwards; correct?

8    A.    Correct.

9    Q.    And, in fact, you never 'til this day asked her

10        whether she tried to hit the kids with her car;

11        correct?

12   A.    Correct.

13   Q.    Now, the police arrived and you had some

14        conversation with them?

15   A.    Yeah, I told them what the kids had said and then

16        they asked the children what had happened.  And

17        then Victor said to Manny, we have -- you know, we

18        have to do something and that's when they took it

19        in their hands.

20   Q.    What do you mean by that?

21   A.    Then it became a police matter.

22   Q.    Became a police matter because of your call?

23   A.    Yes.

24   Q.    And then when you say it became a police matter,

71

1      game, he wasn't there when my children gave their

2      depositions.  Katie, Matthew and Amanda, I took

3      them down to the police station.

4                MS. GELLER:  Do you mean depositions?

5  Q.  You mean the statements?

6  A.  I mean the statements.  Sorry.

7  Q.  What time did you go to the police station?

8  A.  It was after lunch, it was 1:30, 2:00 we got

9      there.

10 Q.  So four or five hours later?

11 A.  Four hours later, yeah.

12 Q.  So how long were the police, Officers Melanson and

13      Pellot at your house after they initially arrived?

14 A.  Fifteen minutes.

15 Q.  During those fifteen minutes, did you sign

16      anything?

17 A.  I might have signed a police statement saying --

18      I'm not sure.  I don't recall.  But I might have

19      signed something there that they --

20 Q.  Okay.

21 A.  -- asked as to what happened and I signed it, I

22      think.

23 Q.  All right.  I've had this document marked as

24      Exhibit 1, I'll show you that.

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CA NO. 05-10152NMG

PAMELA HILCHEY
    Plaintiff,

V.

CITY OF HAVERHILL, JOHN J. GUERIN,
STEPHEN BRIGHI, KIM J. PAROLISI,
LANCE A. DAWKINS, ALAN RATTE,
GARY J. MELANSON, JOHN ARAHOVITES,
VICTOR M. PELLOT, GEORGE DEKEON, JR.,
and WILLIAM LEEMAN,
    Defendants.

### AFFIDAVIT OF LIEUTENANT KEVIN DORR

I, Kevin Dorr, being duly sworn, depose and say:

1. I am a police lieutenant for the Haverhill Police Department.

2. On September 7, 2002, I was the shift supervisor for the Haverhill Police Department.

3. I was advised that three children made criminal allegations against Pamela Hilchey.

4. Officer Melanson provided me with a copy of the incident report and an Application for Complaint (please see Exhibit A). I reviewed each of these documents and based on the seriousness of the allegations, I contacted the clerk's office after reviewing this information.

5. I then had the three witness statements (Exhibits I, J and N) and the Application for Complaint sent to the clerk's office at the Haverhill District Court. At that time, the clerk issued a warrant for the arrest of Pamela Hilchey for three counts of assault by mans of a dangerous weapon, to wit, a motor vehicle.

Case 1:05-cv-10152-NMG    Document 49-6    Filed 08/13/2007    Page 7 of 7
JUL-27-2007 14:34 From:HAVERHILL PD      978 3733981      To:6174390325      P.1/1
Case 1:05-cv-10152-NMG    Document 44-8    Filed 07/30/2007    Page 9 of 9

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ____ DAY OF

JULY, 2007

_____
Kevin Dorr

# EXHIBIT H

ARREST WARRANT

The Commonwealth of Massachusetts
District Court Department

02 38 CR 1669

| NAME, ADDRESS & ZIP CODE OF DEFENDANT | COURT DIVISION |
|---|---|
| Pamela Hilchey<br>1 Courtland Rd<br>Haverhill, Ma. 01830 | Haverhill District Court<br>J P Ginty Blvd. - P.O. Box 1389<br>Haverhill, Ma 01831 |

REASON FOR WARRANT:

☐ Representation of prosecutor that defendant may not app-<br>unless arrested.
☐ Defendant failed to appear after being summoned to appe
☐ Defendant failed to appear after recognizing to appear
☐ Defendant failed to pay court ordered monies in the<br>amount of $
☐ Defendant failed to appear for probation surrender hearing
☑ Other. Serious Charge

| DATE OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|
| 8-26-58 | F | W | | | | |

POLICE INCIDENT NO

SOCIAL SECURITY NO  023 52 3818

DATE OF OFFENSE  9/7/02

DATE & TIME WARRANT ISSUED  9/7/02  6:00 P.M.

POLICE DEPARTMENT TO WHICH ISSUED  Haverhill

| COUNT | WMS OFFENSE CODE OR G.L. CHAP. & SEC | OFFENSE DESCRIPTION |
|---|---|---|
| 1, 2 & 3 | Chap 265 §15B | Assault by Means of A Dangerous Weapon, To wit m/v (3 counts) |

## TO ANY OFFICER AUTHORIZED TO SERVE CRIMINAL PROCESS:

The Court has ordered that a ☑ WARRANT ☐ DEFAULT WARRANT issue against the above defendant. Therefore you are hereby commanded to arrest the above named defendant and bring the defendant forthwith before this Court, except as otherwise permitted by G.L. c. 276, §§ 29, 32 & 57-58

## IMPORTANT NOTICE TO POLICE CONCERNING THIS PAPER WARRANT

This temporary paper warrant is issued at a time when it cannot be entered on the Commonwealth's computerized Warrant Management System (WMS). YOU MUST RETURN THIS PAPER WARRANT TO THE ISSUING COURT, AND DELETE ANY ENTRY CONCERNING THIS WARRANT THAT YOU HAVE MADE ON LEAPS OR ANY OTHER COMPUTERIZED WARRANT SYSTEM, ON THE NEXT COURT DAY WHEN THE WMS IS AVAILABLE TO THE ISSUING COURT TO ENTER THIS WARRANT. You will receive no other notice from the court reminding you to do so

Beginning on the next court day after its issuance, do NOT assume that this warrant is still in effect without first checking its current status on the WMS (or, if it does not yet appear on the WMS, with the issuing court's clerk-magistrate).

WITNESS: Kevin Herlihy

| | DATE & TIME ISSUED AND SHOWN ABOVE | CLERK-MAGISTRATE / ASST. CLERK  X |
|---|---|---|

RETURN OF SERVICE

I certify that:

☑ The defendant has been arrested as ordered by the Court.

☐ I am returning this warrant without service to the court. I understand that this warrant has now been or will be reissued through the Warrant Management System.

| DATE OF RETURN  9/7/02 | TITLE OF PERSON MAKING RETURN  Sergeant John | SIGNATURE OF PERSON MAKING RETURN  X |
|---|---|---|

DC CR 4 (10/95)

# EXHIBIT I

# Haverhill Police Department
## Narrative/Report Summary

Arrest [ ]     Complaint Application [ x ]     Protective Custody [ ]

| | |
|---|---|
| Officer: | Gary Melanson |
| Date: | 09/07/02 |
| Case No: | |
| Booking No: | |
| Defendant: | Pamela Hilchey |

Narrative:

Officer Melanson will testify;

On Sept. 7, 2002 he as well as Sgt Pellot were dispatched to 49 Pear Tree Lane on an assault complaint. The officers had a conversation with Phyllis Monigle. Mrs. Monigle informed the officers that two of her children as well as another child were riding their bicycles at the entrance of Pear Tree Lane. At approximately 0910 AM the suspect Pamela Hilchey drove into the development. The children said that they were riding their bicycles in the street when Mrs. Hilchey drove her Chevy Ta.Ho truck at them. They children got scared. They saw Mrs. Hilchey drive out of the development and then come back approximately 10 minutes later and drive into her driveway at #1 Cortland Road. The children went home and told Mrs. Monigle and she called the police.

Mrs. Monigle informed Officer Melanson that there has been an ongoing dispute with Pamela Hilchey and this Pear Tree neighborhood for the past two years.

Officer Melanson spoke to the children and confirmed the story that Mrs. Gonigle had told him.

Officer Melanson went back to the station and applied for a complaint.

_____  #57         _____
Arresting Officer                     Officer in Charge

Melanson
3/28/07
Exhibit No. 5
R. Picariello

# EXHIBIT J

1

```
 1                                   Volume: I
                                    Pages: 1 to 62
 2                                  Exhibits: 1 to 6

 3              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 4                        Civil Action No. 05-10152NMG

 5
         PAMELA HILCHEY,                      )
 6              Plaintiff,                    )
                                             )
 7         vs.                                )
                                             )
 8         CITY OF HAVERHILL, JOHN J.         )
           GUERIN, STEPHEN BRIGHI, KIM        )
 9         J. PAROLISI, LANCE A.              )
           DAWKINS, ALAN RATTE, GARY J.       )
10         MELANSON, JOHN ARAHOVITES,         )
           VICTOR PELLOT, GEORGE DEKEON,      )
11         JR., and WILLIAM LEEMAN            )
                Defendants.                   )
12

13

14              DEPOSITION of VICTOR PELLOT, a witness

15         called on behalf of the Plaintiff, taken pursuant

16         to the Massachusetts Rules of Civil Procedure,

17         before Robin Picariello, Registered Merit Reporter

18         and Notary Public, at the Offices of Weston,

19         Patrick, Willard & Redding, P.A., 84 State Street,

20         Boston, Massachusetts, on March 26, 2007

21         commencing at 9:22 a.m..

22

23                           R.P. REPORTING
                               63 East Street
24              Pepperell, Massachusetts 01463
                              (978) 433-8285
```

ORIGINAL        R.P. REPORTING (978) 433-8285

14

1          So you saw the cruiser, you had the

2    call and you parked your car and you went into the

3    house in front of which that cruiser was --

4  A.   Yes.

5  Q.   -- is that correct?

6  A.   That's correct.

7  Q.   Who was inside the house when you got there?

8  A.   A few of the parents.

9  Q.   A few of them?

10 A.   Yeah.

11 Q.   Can you recall who they were?

12 A.   No, I can't.  I went inside the house, Officer

13      Melanson briefed me on what was going on.

14 Q.   What did he tell you?

15 A.   He said that Pamela Hilchey had allegedly ran --

16      driven her car towards some children at a bus

17      stop.

18 Q.   At a bus stop?

19 A.   Mm-hmm.

20 Q.   Did he tell you where the bus stop was?

21 A.   I don't believe so.  I think he -- I don't recall

22      whether he told me where the bus stop was.

23 Q.   Okay.  Are you familiar with the subdivision where

24      Pear Tree Road is?

19

```
 1         that you had in terms of authority at that time
 2         with Officer Melanson.
 3    A.   Mm-hmm.
 4    Q.   So I want to understand whether you had the
 5         authority to direct him to make a complaint, did
 6         you have that authority?
 7    A.   Yes, I had that authority.
 8    Q.   So when you say, do what he had to do, did that
 9         mean you must make your own assessment of the
10         situation?
11    A.   What I --
12              MR. STEWART:  Objection.  Go ahead, you
13         may answer.
14    Q.   As far as you're concerned.  I mean, I'm just
15         trying to understand what you meant by do what you
16         need to do.
17    A.   Right.  Do what you have to do means, he's a
18         competent police officer, he's a detective on the
19         police department, he investigates crimes and
20         stuff, he knew what needed to be done so I can
21         trust him to do what was necessary, that's --
22    Q.   Okay.  Do your duty, in other words?
23    A.   Absolutely.
24    Q.   That's what that means?
```

26

```
 1        BY MR. MILLER:
 2   Q.   I've just handed you, Officer Pellot, what has
 3        been marked by the reporter as Exhibit 3 for
 4        identification, take a moment, please, and read it
 5        through.  When you've finished, let me know.
 6             (Pause)
 7   A.   Okay.
 8   Q.   I'd like to refer you, Officer Pellot, to the
 9        second sentence in the first full paragraph which
10        is a Haverhill Police Department's supplemental
11        report dated September 8th, 2002.  "After speaking
12        with the victims and their parents, Melanson was
13        advised by Sergeant Pellot to go to the police
14        station and apply for a complaint to summons
15        Pamela Hilchey to court."  Your best recollection
16        today is that that's not true; is that correct?
17   A.   That's correct.
18   Q.   Have you at any time previous to today seen this
19        supplement report, to the best of your
20        recollection --
21   A.   No.
22   Q.   -- as we sit here today?
23   A.   No.
24   Q.   Have you had any conversations with Officer
```

# EXHIBIT K

| | | | | | | |
|---|---|---|---|---|---|---|
| Hate/Bias Crime | Y ☐ N ☑ | | **HAVERHILL POLICE DEPARTMENT INCIDENT REPORT** | | CASE # *200 8027* | |
| Domestic Violence | Y ☐ N ☐ | | | | ACTIVITY # *203 2036* | |

| Date & Time of Report | mo. | day | yr. | time |
|---|---|---|---|---|
| | 9 | 7 | 02 | 0930 |

INCIDENT: *ASSAULT D/W*    LOCATION: *PEAR TREE LANE*

TIME OF OCCURENCE    TYPE OF PREMISE

| FROM | | | | TO | | | | CLASS CODE | PRIOR VICTIMIZATION | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MO. | DAY | YR. | TIME | MO. | DAY | YR. | TIME | | YES | NO | DATE: |
| 9 | 7 | 02 | 0910 | 9 | 7 | 02 | 0910 | 918C | | | |

INVL CODE:  M - Missing  O - Owner  R - Reporting  V - Victim  W - Witness  Y - Other

| CODE | NAME | SSX | ADDRESS | RACE | DOB | PHONE |
|---|---|---|---|---|---|---|
| R | *MONIBLE, PHYLLIS* | F | *49 PEAR TREE LANE HAV* | W | *5-31-64* | W #*978-521-0081* |
| V1 | *MONIBLE, KATELYN* | F | *49 PEAR TREE LANE HAV* | W | *2-18-93* | / / |
| V2 | *MONIBLE, MATTHEW* | M | *49 PEAR TREE LANE HAV* | W | *7-11-97* | / / |
| V3 | *BASTEASH, AMANDA* | F | *1 MIDDLE LANE HAV* | W | *1-2-93* | *978-457-0656* |

SUSPECT 1:
LAST: *HILCHEY*    FIRST: *PAMELA*    MIDDLE:    GEN:    AKA:

SUSPECT 1 ADDRESS:  *1 COURTLAND ROAD    HAVERHILL    MASS*

RESIDENCE PHONE:    OTHER PHONE:    OCCUPATION:

| RACE | SEX | DOB | HT | WT | HAIR | EYES | DL NUMBER | STATE | CLASS | HAZARD Y/N |
|---|---|---|---|---|---|---|---|---|---|---|
| W | F | *5-26-58* | | | | | | | | |

DISPOSITION: (CIRCLE ONE)    RIGHTS WARNING
1 - ARRESTED/BOOKED  2 - ARRESTED/RELEASED  3 - ARRESTED/CITED/RELEASED  4 - NOT ARRESTED  (5 - COMPLAINT APP)    DATE    TIME

MISC INFORMATION:

SUSPECT 2:
LAST:    FIRST:    MIDDLE:    GEN:    AKA:

SUSPECT 2 ADDRESS:

RESIDENCE PHONE:    OTHER PHONE:    OCCUPATION:

| RACE | SEX | DOB | HT | WT | HAIR | EYES | DL NUMBER | STATE | CLASS | HAZARD Y/N |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

DISPOSITION: (CIRCLE ONE)    RIGHTS WARNING
1 - ARRESTED/BOOKED  2 - ARRESTED/RELEASED  3 - ARRESTED/CITED/RELEASED  4 - NOT ARRESTED  5 - COMPLAINT APP    DATE    TIME

MISC INFORMATION:

SUSPECT #1 (CIRCLE ONE)  TT-TATOO  MO-MOLE  TH-TEETH  SC-SCAR  GL-GLASSES  OT-OTHER

SUSPECT #2 (CIRCLE ONE)  TT-TATOO  MO-MOLE  TH-TEETH  SC-SCAR  GL-GLASSES  OT-OTHER

| REPORTING OFFICER SIGNATURE | ID# | DATE OF REPORT | SUPERVISOR'S APPROVAL - SIGNATURE | DATE |
|---|---|---|---|---|
| | 57 | *9-7-02* | | |

☐ INFORMATION ONLY  ☐ JUVENILE    DATA ENTRY CLERK NAME    DATE ENTERED INTO SYSTEM
☐ PATROL FOLLOW UP  ☐ SUBMIT FOR JUDICIAL ACTION

**VEHICLES**

AVAILABLE INVOLVEMENT CODES: P-SUSPICIOUS H-DAMAGED A-ABANDONED I-IMPOUNDED U-INVOLVED N-INCIDENT O-SUSPECT

| CODE | LICENSE NUMBER | LIC STATE | TYPE | LICENSE (MO/YR) | MAKE | MODEL | STYLE | YEAR | PRIMARY COLOR | SECOND CO |
|------|----------------|-----------|------|-----------------|------|-------|-------|------|---------------|-----------|
| U | | | | | | TA-HOE | | | GREEN | SILVER |

VEHICLE TYPES: A-PASSENGER AUTO     B-VAN OR PICKUP TRUCK     C-TRUCK     D-MOTORCYCLE     E-OTHER

**PROPERTY**

PROPERTY TYPE CODES: M-MISCELLANEOUS B-BICYCLES D-DRUGS C-CHECKS

| TYPE CODES | DESCRIPTION (COMMON NAME) | INV CD | ITEM MANUFACTURER | MODEL NUMBER | SERIAL NUMBER | VALUE | QUANTITY |
|------------|---------------------------|--------|-------------------|--------------|---------------|-------|----------|
| | | | | | | | |

PROPERTY INVOLVEMENT CODES: C-CONFISCATED D-DAMAGED E-EVIDENCE F-FOUND K-SAFEKEEPING L-LOST R-RECOVERED S-STOLEN X-OTHE

**SOLVABILITY**

(checkbox code sections for MODE OF ENTRY CODES, POINT OF ENTRY CODES, VICTIM ACTIVITY CODES, STRUCTURE TYPE CODES, TARGET CODES, SUSPECT ACTION CODES, SECURITY USED CODES, INVESTIGATION POINTS CODES)

EVIDENCE OBTAINED CODES: 1 □ Prints   2 □ Weapon/Tools   3 □ Vehicle   4 □ Photos   5 □ Hair   6 □ Stains   7 □ Blood/Semen/Body Fluids   8 □ None   9 □ Other

Was a suspect arrested?
Can a suspect be named?
Can a suspect be located?
Can a suspect be described?
Is there significant reason to believe the crime may be solved?
Was there a witness to the crime?
Is there a significant M.O. present?
Is stolen property traceable?
Is there significant physical evidence?
Are all elements of crime present?
Was major injury or rape involved?
Can suspect be identified?
Can suspect vehicle be identified?

**NARRATIVE**

(R) STATED V1, V2, V3, REPORTED THE FOLLOWING.
3. AT APPROX 0910 V1, V2, V3 WENT RIDING THEIR
BICYCLES IN THE NEIGHBORHOOD. THEY WENT
5. AT THE END OF THE DEVELOPMENT AND (S)
DROVE TOWARDS THEM. (V's) GOT SCARED AND HAD TO
6. MOVE OUT OF THE WAY. (S) LEFT THE AREA
7. AND CAME BACK AND (V's) SAW HER DRIVE
INTO HER DRIVEWAY. (V3) SPOKE TO THIS OFFICER
9. AND CONFIRMED THE STORY. (V1) IS FAMILIAR
10. WITH (S) SGT RELLOS ON SCENE
11. A COMPLAINT WILL BE FILED
12.

VICTIM-REPORTING PARTY SIGNATURE  X _____

CASE STATUS:   O OPEN    C - CLOSED    U - UNFOUNDED    (CIRCLE ONE)

**EXHIBIT L**

HAVERHILL POLICE DEPARTMENT

| Date/Time of Report | MO. | Day | Yr | Time |
|---|---|---|---|---|

Case # 2008027

Activity # 7072-036

NARRATIVE

From: Katelyn M. Monigle          9/7/2002

DOB: 2-18-93

Address: 79 Pear Tree Rd.

Tele: 978-521-0081

Statement Began 2:15 pm.

Today at around 9:11 in the morning I was with my friend Amanda, my brother Matt and my next door neighbor Kevin. We were all riding our bikes in front of my house. We were going in and out of driveways and rode in the street. We always look for cars when we are in the street. While we were in the street, my brother Matt yelled that Pam was coming in her car (or should I say truck). I turned and saw it was Pam Hickey. I know it was her because she lives near by and I know her truck is a little silver on the bottom and the rest is green. I also saw it was Pam driving and she was alone. Me and Amanda drove up on the sidewalk to get out of her way

| Reporting Officer | ID# | Reviewing Officer | Date |
|---|---|---|---|

PAGE _____ OF _____

Katelyn M. Monigle,

HAVERHILL POLICE DEPARTMENT

| Date/Time of Report | Mo | Day | Yr | Time |
|---|---|---|---|---|
| | | | | |

Case # 2008027

Activity # 203 2026

NARRATIVE

K1YI, JAY: Me and Amanda saw that my brother Matt who is only 5 and Kevin who is only 6 still in the street. We ran into the street to get them out of the way of Pam's truck. Pam was driving fast and drove right at us. I got real scared because we couldn't get out of the way in time. When Pam's truck passed us it was about (Katelyn made gesture to this officer showing about eight inches) Pam's truck then went by us and drove up Russet Hill Rd. I don't know why Sir drove down our street because her house is before where we were Riding. I don't think Pam likes me because she has threatened me before saying she was going to put me in jail because in the first grade I got in a fight with Pam's daughter Lindsey Hitchen who was also my age. After Pam's truck passed us me and Amanda ran into my house and told my mom what Pam just did.

| Reporting Officer | ID# | Reviewing Officer | Date |
|---|---|---|---|
| | | | |

~Katelyn Monigle    PAGE ____ OF ...

## HAVERHILL POLICE DEPARTMENT

| Date/Time of Report | Mo | Day | Yr. | Time |
|---|---|---|---|---|
|  |  |  |  |  |

Case # 200 8027

Activity # 203 2026

NARRATIVE:

KH My Mom then called the Police Before the policeman came to my house we saw Pam drive into her driveway. It was about five minutes after she passed us The policeman came to my house and spoke with us. The truck Pam was driving was going real fast when it passed us I don't know how fast it was going but it was going faster than cars usually go on my street.

Det DeKeon read back this statement to me with my Mom with me. This is what happened. KH

＊Katelyn Honigle.

Statement ended 2:45 pm

Det. Sgt. Duff                (signature) M ___
                                    Mother

| Reporting Officer | ID# | Reviewing Officer | Date |
|---|---|---|---|
|  |  |  |  |

PAGE ___ OF ___



**EXHIBIT M**

Haverhill Police Station

Date: Sept. 7, 2002

Time: 1440

Statement by Matthew Mcnigle 7/ 11/02

To: Officer Gary Melanson

Today around 9:10 AM I was riding my bicycle with my sister Katelyn and Amanda Basterash. We were in front of my house on the bicycles. We saw Pam drive by her house and then drive towards us. Katelyn and Amanda were very scared because of Pam driving close towards them. Pam left and we saw her turn into her driveway a little later. We went in the house and told our parents later.

Statement Ended 1455PM

# EXHIBIT N

A.B. Statement given by Amanda Bastarache 1-1-98 of 1 Middle Rd Haverhill, Ma. with parents Amy and Jim Bastarche present to Det Lance Dawkins & Officer Gary Melanson on 9-7-02 at 2:35 PM at the Haverhill Police station. A.B.

A.B. Around 9:00 this morning I was playing with Katelyn and Matthew Monigle at their house. I slept over. We were all riding on our bicycles. (A.B. we figured playing at the cul-de-sac would be a safe area, there is not a lot of traffic there at all). We were near the sidewalk. I saw Pam Hilchey coming down the street in her green truck. She was alone. Pam lives across the street from Katelyn and Matthew. She was going fast. She was going over the speed limit. We were all on the side of the road. We were going as fast as we could onto the sidewalk because Pam was going fast towards us. As she got close to us she veered over towards us. I saw her face. She had kind of a mad look. She kept coming towards us. She drove near us. She had to turn the wheel towards us. I thought she was going to hit us. It scared us, then she turned back and then she went all the way down and went up Russett Hill and didn't come back until five minutes after. And then when she came back she went into her driveway. She went into her garage and then closed the door. We were in front of Katelyn's house the whole time. Me and Katelyn told her mom what happened and she called the police. (A.B. she used to play at that house, with Lindsey Hilchey. We used to go on field trips with the school, Lindsey's father used to go, that's how we met his wife) A.B.

A.B. I'm not happy at all. Now she drives at them with a car  Something better be done. I want something done, I'm willing to press charges. A.B.

Amanda Bastarache        Amy Bastarache

Det. Lance Dawkins        Off. Gary Melanson

**EXHIBIT O**

PRELIMINARY INVESTIGATIONS

## GENERAL CONSIDERATIONS AND GUIDELINES

The ultimate success or failure of police
efforts in the identification, apprehension and
subsequent prosecution of criminal offenders is
often based upon the immediate response and
effective action of the officer making the
preliminary investigation. What the first officer
on the scene does or fails to do upon his arrival
at what is sometimes an emotionally charged
situation, can greatly affect the final outcome of
a particular case.  His actions at this early and
critical stage may make the difference between a
rapid and successful conclusion to the case or a
long and often frustrating follow-up investiga-
tion.  The preliminary investigation should never
be handled routinely as it is not only a vital
link in the criminal investigation process but it
can often be the means of uncovering information
leading to the solution of other crimes or for
initiating crime prevention procedures.

The preliminary investigation is generally
the responsibility of officers assigned to patrol
duty.  The patrol officer is nearly always the
first police officer on the scene of a reported
crime--whether he learns of the crime as a result
of a radio call, or a call for assistance from a
citizen or from his own personal observations.
Patrol officers in radio equipped vehicles are
relied upon for making preliminary investigations
because of their ready availability and specific
capability for furnishing prompt and efficient
service at any hour, day or night.  They are also
more likely to be familiar with the particular
area where a crime occurs and can be most
effective in apprehending a suspect criminal
offender at or near the scene.

A thorough preliminary investigation is most
essential to the success of any follow-up
investigation.  It is because of this that
effective coordination between patrol and
investigative officers is so important.  It is the
ability of the patrol officer to initially
discover facts, to locate and identify witnesses
and to preserve physical evidence that is relied
upon by the police investigator in his subsequent

search for the suspected criminal. It is for this reason that every effort should be made to maintain a cooperative relationship and good communications between the patrol force and the investigative unit. A free flow of information is a necessity in this regard as each of these police functions are dependent upon the other. A patrol officer develops a considerable amount of information about the area he regularly patrols and he acquires an intimate knowledge of the people who frequent that area which can be of great assistance in conducting criminal investigations. This information should be made available to detectives and other investigating officers if the objectives of the police department are to be effectively achieved.

It should be carefully noted that many crimes go unsolved because the officer making the preliminary investigation fails to recognize the value of physical evidence that may be found at the scene. Although such evidence can generally be recognized by an observant and perceptive officer, in some cases, it is not quite so obvious and may be overlooked. The courts often give greater weight to such physical evidence than to the direct evidence of witnesses which is subject to human defects. The evidentiary value of physical evidence, however, can be easily destroyed if it is not carefully handled and secured, in accordance with departmental procedures, for subsequent submission to the court. In order for physical evidence to be admissible the prosecutor must be able to establish a "chain of custody" of that evidence from the moment it comes into the possession of the police at the crime scene to the time of the court trial. Every officer who handles this evidence must be prepared to establish how he received it, how he safeguarded it and how he relinquished it.

It should also be noted that a good preliminary investigation can lose much of its effectiveness if it is poorly reported. First observations are particularly important and should be recorded as soon as possible. A written report of the incident should be as complete, accurate and concise as possible if it is to serve its intended purpose of communicating a good understanding of what happened to others who were not present but who must subsequently read this report and act upon it for police or prosecution purposes. A report of a preliminary investigation should be as complete as possible to avoid follow-

28-2

up interviews and supplementary reports--it should
be as accurate as possible to avoid confusing the
facts with personal opinions or conclusions--and
it should be as concise as possible, without
sacrificing completeness, to avoid obscuring the
facts with superfluous or nonessential informa-
tion.  While most police departments utilize
standardized forms designed to capture all
necessary preliminary investigation data, a
narrative-type report should be prepared and
submitted for all serious incidents and major
offenses.  The principal purpose, therefore, of a
preliminary investigation is to gather, record and
report information.  This information may be
obtained from "persons" and become testimonial
evidence or it may be obtained from "things' and
become physical evidence.  Neither of these
sources should be overlooked.

In conducting investigations of criminal and
non-criminal incidents, police are often called
upon to make warrantless entries and conduct
warrantless searches and seizures.  The legal
standards which govern such warrantless entries,
searches and seizures are covered in the
departmental policy and procedure "Search &
Seizure."  Other departmental policies and pro-
cedures which pertain to the topics discussed
below are "Arrests," "Custodial Interrogation,"
"Evidence" and "Interviewing Witnesses."

It has been noted in Comm. v. Murphy, 353
Mass. 433, 233 N.E.2d 5 (1968), that a police
officer who enters upon private premises in good
faith in the performance of official duties in
order to protect life and property and to preserve
the peace is not a trespasser.  This authority,
however, is limited to bona fide emergency
situations, unless the officer has the judicial
authorization of a valid warrant or consent to
enter is granted by a person in lawful control of
the particular premises.  For a more detailed
discussion of these issues, see departmental
policies on "Arrests" and "Searches and Seizures."

In carrying out the following basic
procedures, all other departmental policies
including "Interviewing Witnesses," "Interrogating
Suspects" and the "Handling, Preservation and
Security of Evidence" should also be reviewed and
complied with.

PROCEDURES

1.  Patrol or other officers proceeding to a crime scene should do so promptly, but with all due regard for their own safety and for the safety of the public.

2.  Officers should not proceed to a crime scene unless:

    a.  they are specifically directed to respond;

    b.  the crime occurs or is discovered within their assigned area of patrol; or

    c.  it is their particular assignment to be generally responsible for conducting investigations.

3.  All other officers should remain on the perimeter of the reported crime scene ready to assist in the apprehension of the offender or to perform such other duties as directed.

4.  Officers proceeding to a crime scene should be vigilant and watchful in their approach for any signs of suspicious activity, especially for any evidence of a fleeing criminal or for persons acting suspiciously or furtively in the vicinity.

    a.  responding officers should also note and record the registration numbers of any suspicious vehicles coming from the scene and the general description and any obvious characteristics of the operator or occupants;

5.  The officers proceeding to the crime scene should be alert for any additional messages from the Dispatcher.

    a.  the Dispatcher should immediately furnish the responding officers with any supplementary or additional information that would be of assistance to them, especially any available information that would indicate the possibility of a

dangerous situation or the possible
presence of an armed or dangerous
criminal.

6. The first officer arriving at the scene
should be responsible for initiating and
conducting the preliminary investigation
and should yield his responsibility only
when so directed by a superior officer
or upon the arrival of a detective or
other officer especially assigned to
conduct criminal investigations.

   a. all information obtained up to that
   point, and the identity and
   location of any physical evidence
   discovered, should be turned over
   to the detective or investigator
   upon his arrival.

7. The first officer arriving at the scene
should quickly determine the necessity
for obtaining medical assistance or
administering first aid.

   a. if this would permit the offender
   to escape, the assistance of other
   persons at the scene should be
   obtained to aid the injured
   parties;

   b. if the injury requires hospital
   treatment or if the victim requests
   to go to a hospital, the officer
   should contact the Dispatcher
   without delay to obtain immediate
   medical assistance for the victim.

8. When it is determined that a crime has
occurred which is an arrestable offense,
the officer should then seek to arrest
the perpetrator if there is a reasonable
likelihood that an apprehension can be
made. Some of the factors which should
be considered in determining whether or
not the officer should leave the scene
for this purpose are as follows:

   a. the physical condition of the
   victim;

   b. the need to protect the victim from
   a renewed attack;

28-5

    c.   the nature of the crime committed;

    d.   the time and place of occurrence;

    e.   the lapse of time between the crime and the arrival of the police at the scene;

    f.   whether the suspect is known to the officer or a good description of the offender is available;

    g.   the availability of other officers to conduct the pursuit and to apprehend the offender.

9. As soon as it is practicable under the circumstances, the officer should communicate to the Dispatcher the following information:

    a.   the nature of the crime committed;

    b.   as complete a description of the offender as possible and the direction of his flight;

    c.   whether the offender is, or may be armed and dangerous;

    d.   a description of any vehicle being used by the offender and of any occupants of that vehicle;

    e.   a description of any firearms or other weapon used in the commission of the crime;

    f.   a description of any property stolen and whether it may be in the possession of the offender;

    g.   any additional information that may lead to the apprehension of the offender;

    h.   whether additional assistance or the services of evidence technicians are needed at the scene.

10. Every effort should be made to protect the crime scene for the preservation of

any physical evidence. (See depart-
mental policy on "Handling, Preservation
and Security of Evidence.")

a.  insofar as possible the crime scene
    should be maintained in the same
    manner as it was left by the
    perpetrator. Generally, spectators
    and bystanders should be ordered
    away. Persons connected to the
    crime and persons associated with
    the property or premises involved
    in the crime should be ordered to
    remain present and available for
    questioning but they should be told
    not to alter or disturb any aspect
    of the crime scene; unauthorized
    persons should not be permitted to
    enter or disturb the crime scene
    (this includes any police personnel
    not necessary for the investi-
    gation). If necessary, the
    premises or area comprising the
    crime scene may be roped or
    cordoned off, locked or otherwise
    secured;

b.  look for any item of evidentiary
    value which may reveal how the
    crime was committed or anything
    which may connect a particular
    person to the scene;

c.  this would include, but is not
    limited to the following:

    i.   weapons, shell casings, tools,
         clothing, shattered glass,
         stains, footprints, finger-
         prints, tool impressions, tire
         markings, etc.;

    ii.  ordinary objects or articles
         found in unexpected or unusual
         locations;

    iii. ordinary objects or articles
         having individual peculiar-
         ities or markings;

    iv.  uncommon objects or articles
         not generally found at the
         location of the particular
         crime;

28-7

        v.   bits and pieces of evidence
which may individually be of
minor importance but when
taken together can be of
significant value to the
investigation.

11. Physical evidence should not be moved or
touched pending the arrival of evidence
technicians unless it is absolutely
necessary to assure its preservation.

    a.   if it is necessary to move or take
custody of any physical evidence a
careful notation should be made of
its exact location and position at
the scene;

    b.   if it is necessary to move any item
of physical evidence the item
should be handled in such a manner
as to prevent any alteration in its
condition or the accidental
impression of fingerprints.  See
departmental policy and procedure
on "Evidence."

12. Every effort should be made to locate,
identify and interview reliable
witnesses. (See departmental policy on
"Interviewing Witnesses.")

    a.   witnesses should be interviewed as
soon as possible and in a  quiet
area if available;

    b.   witnesses should be interviewed
separately to ensure independent
statements;

    c.   when interviewing witnesses
(including victims) assess each
witness' objectivity or possible
bias; any relationship or
connection the witness might have
with the victim or perpetrator or
the property or premises involved
in the crime; the overall
credibility of the witness; his
opportunity to make observations;
his ability to recall details as
opposed to general impressions,
etc.;

d.   after all witnesses located at the
     scene have been interviewed it may
     be advisable to canvass residences
     and businesses in the area in order
     to locate persons who did witness
     some aspect of the crime but who
     are reluctant to come forward with
     that information;

e.   the purpose of these preliminary
     interviews is to obtain as much
     basic information as quickly as
     possible in order to identify and,
     if possible, apprehend the
     perpetrator and to establish the
     basis for the follow-up investiga-
     tion.

13.  To conduct an effective preliminary
     interview of witnesses:

a.   be tactful and patient;

b.   ask only one question at a time;

c.   ask questions in plain, easily
     understood language;

d.   avoid asking questions that imply a
     particular answer;

e.   avoid interruptions, if possible;

f.   before using any person at the
     scene as an interpreter make sure
     the person chosen to serve as
     interpreter is reliable; if
     possible, take the precaution of
     asking a second person who knows
     the foreign language to listen to
     the interpreter and notify the
     officer if the interpreter fails to
     translate any question or answer
     accurately and completely.

14.  An officer making a preliminary
     investigation should not rely on his
     memory but should note all useful
     information obtained and, as a minimum,
     should make a written record of the
     following data:

a. date and time of arrival at scene;

b. weather conditions and visibility, including the location and distance from the nearest street light or artificial lighting and whether the lights were on;

c. approximate time of commission of the crime and by whom it was discovered

d. identity of other police officers present;

e. all necessary information concerning any physical evidence discovered;

f. name, address and telephone number of victims and witnesses;

g. the identity or the best available description of the criminal suspect or suspects, particularly noting any unusual characteristics;

h. the best available description of any vehicle used by the suspect or suspects

i. any important measurements made at the scene and a rough crime scene sketch; the name of any police photographer who took pictures, the name and affiliation of any media photographer who took pictures, the name and address of any private individual who took pictures;

j. the time, and location of any interviews of the victim or witnesses and a brief statement as to what they heard or observed;

    i. if any such statement appears to be highly informative and the crime is of a serious nature, a verbatim record should be made;

k. any other information that the officer believes may be useful for

the apprehension of the criminal
suspect and his subsequent prosecu-
tion.

15. The officer conducting a preliminary
investigation should make an accurate
and complete written report of the
incident in accordance with departmental
procedures.

16. The following check-list summarizes the
duties of a police officer conducting a
preliminary investigation at the scene
of a crime:

a. care for any person who requires
medical or first aid attention;

b. arrest the perpetrator of the
crime, if possible;

c. arrange for the immediate pursuit
of the perpetrator if his flight is
recent and initiate his pursuit
personally if the possibility of
immediate capture is likely;

d. furnish to the Dispatcher the best
possible description of the
perpetrators giving a brief outline
of the crime committed, the method
and direction of the suspect's
flight and whether he is considered
armed and dangerous;

e. carefully secure the crime scene
from disturbance or alteration and
carefully locate and preserve all
physical evidence;

f. seek out witnesses and require that
they remain at the scene until
interviewed;

g. identify all persons present at the
scene and record their names,
addresses and telephone numbers;

h. record the registration numbers of
any motor vehicles at the immediate
scene;

28-11

i.   be curious and suspicious, don't
     take anything for granted and don't
     jump to conclusions;

j.   listen for and make note of any
     unguarded or spontaneous remarks or
     comments relevant to the incident
     made by witnesses or others present
     at the scene;

k.   note any extreme nervousness,
     unusual behavior or conflicting
     statements made by witnesses or
     others present;

l.   make inquiry of neighbors or
     bystanders as to their knowledge of
     any suspicious persons or vehicles
     in the vicinity prior to the crime;

m.   note and record conditions at the
     crime scene such as time of
     incident, time of initial report of
     incident, who made the report, the
     weather, visibility, street
     lighting, description of any
     weapons used or injuries caused,
     description of any property stolen
     and all other pertinent informa-
     tion;

n.   note and record as complete a
     description as possible of the
     suspect (see "Interviewing
     Witnesses" on obtaining a good
     physical description;

o.   upon arrival of a superior officer
     or detective who will continue the
     investigation in more depth, inform
     them of the information already
     obtained, physical evidence located
     and the immediate steps that have
     been taken;

p.   return to normal patrol duties as
     soon as practicable and make a
     written report of the incident and
     any action taken in accordance with
     standard department procedures and
     practices;

q.   officers should be continually
     aware that any preliminary investi-

gation is just that -- it is
preliminary.  No final conclusion
should be reached if contrary
possibilities or explanation are
still unaccounted for.  For
example, it is not uncommon for
perpetrators, caught shortly after
the incident (and especially if the
victim has fled) to claim that they
are merely a witness and try to
direct the police on a wild goose
chase.  A perpetrator may even pose
as a victim (especially if he or
she did receive some injury).
Also, witnesses and victims may be
carrying weapons or may flare up in
unexpected anger or aggression
toward others or even toward the
police.  Calling for sufficient
backup and a healthy skepticism
when questioning persons the
officer does not know can be
invaluable aids in any "prelim-
inary" investigation

# EXHIBIT P

**UNOFFICIAL TRANSCRIPT**

Track Length:  1: 40

(Answering recording)

(Push-button tone making selection)

| | |
|---|---|
| Response: | Haverhill Police (inaudible). |
| Caller: | This is Phyllis Monigle calling, of 49 Pear Tree Road.  My children were out riding their bikes in front of their . . . my house.  I have four children here.  And Pam Hilchey came through the development, did not turn in to her house.  She came straight at the kids. |
| Response: | Oh boy, ah. |
| Caller: | And took off up Russett and left the development. |
| Response: | Okay, and you're at 4…. |
| Caller: | They came runnin' in.  I did not see it, but . . . |
| Response: | The kids did? |
| Caller: | They did. |
| Response: | All right.  You're at 49? |
| Caller: | I'm at 49 and my next door neighbor – her kid was there – is 45. |
| Response: | All right.  If – what I want to know, ma'am, is – I'll send a policeman to 49 now to talk to you at 49.  Is that all right? |
| Caller: | Ah, she's coming into the development now.  She's turning in to her house. |
| Response: | All right.  But I'll have the police officer come over and talk to you.  Okay?  You're at 49? |
| Caller: | Yes, please. |
| Response: | Last name? |
| Caller: | Monigle.  M-O-N-I-G-L-E.  Glen and Phyllis. |

1

Response:        Okay.  I'll have someone over to talk to you ma'am

Track Length:  1:01

(Answering recording)

Please wait (recorded)

Response:        Haverhill Police (inaudible).

Caller:          Hi, Mike.

Response:        Ah, gonna make your day.

Caller:          What have you got now?

Response:        Oh, 49 Pear Tree Road.

Caller:          Oh, please.

Response:        Geez.

Caller:          Chri . . . Is the sergeant going up there?

Response:        I'll have him go up.

Caller:          Good.  Could you have him go up, because I'm just gonna call him.  They
                 told me whenever you go up there, to call the sergeant.

Response:        Right.  She's complaining about Hilchey.  The kids were out on the street,
                 riding their bicycles and she said the Hilchey's wife was driving the car
                 and looked like she went after the kids, like.  So they had to get out of the
                 way.

Caller:          Yep.

Response:        So, I'll have him go up there.

Caller:          Thank you. 49?

Response:        Yeah, she's at 49.  Monigle is the last name.

Caller:          I'll do it.

Track Length:  0:18

2

Caller:        Haverhill control to car two.

Response:      2 Water Street.

Caller:        Would you be able to give me a call?

Response:      Yeah.