February 16, 2008

# Cases where Daniel Wicks has offered an expert opinion at trial, deposition, or reviewed a case for the preceding five years:

2005 -Antolini v. Gayner and City of Meridian, CT (Shooting Death) – Defendant (case settled)
2005 - Cintron v. MBTA Police (Impacts) – Plaintiff (testified, 1 day)
2003 -Cooper v. North Branford, CT (Shooting Death) – Defendant (testified 2 days, split decision)
2006 -Common v. Grinham and Easton, MA (Impacts) {declined case} - Plaintiff
2001 -Crosby v. Mendon, MA (OC Spray) – Defendant (testified 1 day)
2006 -Davenport v. Bristol, CT (Shooting Death) – Defendant (case settled)
2004 -Holeman v. City of New London, CT (Shooting Death) – Defendant (case settled)
2008 – Hilchey v. City of Haverhill, MA (unlawful arrest) – Defendant (case pending)
2005 -Hyman v Middleboro, MA (Impacts, OC Spray) – Defendant (case settled)
2003 -MacLellan v. Stoughton, MA (Impacts) - Defendant
2004 -Nolan v. Belchertown, MA (OC Spray) - Defendant
2003 - Rosa v. East Hartford, CT (Dog Bite) – Defendant (case settled)
2007 –Russell v Derby, CT (Impacts) – Defendant (case settled)
2002- Sabin v. Shallies and Town or Rockland, MA (OC Spray) – Defendant (case settled)
2005 – Silva v. Quincy, MA (jail cell suicide) - Plaintiff {declined case}
2007 - Varallo v. Nantucket, MA (Sexual Assault) – Defendant (case settled)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAMELA HILCHEY<br>Plaintiff, | )<br>)<br>) | |
| Vs. | )<br>) | Civil Action No.:<br>05-10152NMG |
| | )<br>) | |
| CITY OF Haverhill,<br>Defendant. | )<br>)<br>) | |

### AFFIDAVIT OF DANIEL C. WICKS

I, Daniel C. Wicks, hereby depose on oath as follows:

1. The attached report is true and accurate to my findings, evaluation, and opinion and is incorporated by reference in this Affidavit.

Subscribed under the penalties of perjury.

_____
Daniel C. Wicks

1

## The Opinion of Daniel Wicks concerning the arrest of Pamela Hilchey and the conduct of the Haverhill Police Department

I have been requested by Regina M. Ryan, Esquire, of the law firm of Louison, Costello, Condon, & Pfaff, LLP, to examine two (2) issues that pertain to the Hilchey vs. Haverhill case and then provide an expert opinion on these two areas of concern. These issues are:

1.      Did the Haverhill Police Department engage in an illegal or unconstitutional custom or policy which intentionally targeted the Plaintiff and/or her family for illegal prosecution?

2.      Did the Haverhill Police Department have probable cause to arrest Pamela Hilchey (Plaintiff) on September 7, 2002, for assault with a dangerous weapon, pursuant to Massachusetts General Laws Ch 265, Sec. 15B?

**Opinion:**
I, Daniel Wicks have reviewed numerous documents, reports, photographs, sketches (listed below), and visited the scene of the traffic incident, that occurred on September 7, 2002, in the City of Haverhill, involving Pamela Hilchey (Plaintiff) and four (4) local children.  Based on my review of below listed records, combined with my training and experience, as well as the research that I have conducted into law enforcement procedures and practices, I have formed the opinion that the decision to arrest the Plaintiff was based on sound and commonly utilized police methodology and procedures.  The arrest of the Plaintiff was based on sound probable cause, which was clearly present at the time the arrest occurred, this fact is most clearly indicated not by this author, but by the Clerk/Magistrate who signed the warrant authoring the arrest of the Plaintiff.

Further, it is my opinion that City of Haverhill Police Department (HPD) has not engaged in a custom or policy of targeting citizens for illegal and/or unconstitutional harassment or prosecution. Further, the actions taken by the HPD regarding the Plaintiff and her family were reasonable, appropriate and required under the rules and regulations and policies and procedures of the HPD and commonly established police practices.

It is also my opinion that the supervision present at the HPD, on September 7, 2002, was appropriate and well within currently accepted police modus operandi. When the particular facts and circumstances that the HPD officers were confronted with on September 7, 2002, are considered the investigative tactics utilized by Sergeant Pellot and Officer Melanson were effective, efficient, and reasonable.

**Rational for my Opinion**

**Question #1**: Did the Haverhill Police Department engage in an illegal or unconstitutional custom or policy which intentionally targeted the Plaintiff and/or her family for illegal prosecution?

*Supervision* – The City of Haverhill Police Department (HPD) is authorized a total strength of 94 sworn officers[1]  The HPD is permitted one (1) chief, one (1) deputy chief, four (4) captains, four (4) lieutenants, nine (9) sergeants, and seventy-five (75) officers[2].  A ratio of 1 supervisor to 4 officers provides for an ideal supervisory span of control. This falls well within the range of supervisor to staff for police agencies throughout the United States.[3]  The San Francisco Police Department's supervisory ratio is 1 supervisor for every 6 to 8 officers[4].

A study of the New York City Police Department found that close supervision resulted in lower levels of officer misconduct[5].  According to a recent article titled: <u>Police Accountability: Current Issues and Research Needs</u>[6], published by the National Institute of Justice, "*Many departments have official policies requiring a ratio of, for example, one sergeant for every eight officers.  Some investigations have found that misconduct problems have occurred where departments failed to meet their own span of control standard (Bobb, 2002:16).*"  Clearly, the HPD provided adequate supervision for the proper management of its patrol officers and this supervision permitted effective administration of sworn officers under all adverse conditions and critical incident responses, under the most challenging of circumstances.

On the morning of September 7, 2002, Officer Melanson had a specific supervisor to which he reported, Sergeant Pellot[7].  In this case, Sgt. Pellot was called nearly simultaneously[8] and also responded to the incident scene.  In fact the HPD had an established policy to send a supervisor to all calls for service in the Pear Tree and Cortland Roads area[9].

**Haverhill Police Department's Unofficial Policies and/or Customs Concerning the Plaintiff**– After a detailed review of the events, and an examination of the totality of the circumstances leading up to the arrest of the Plaintiff on September 7, 2002, I have identified several policies and practices of the HPD which clearly focused on the Plaintiff as well as the community members located in the Pear Tree and Cortland Road area.

---

[1] HPD annual report for 2003
[2] Ibid
[3] San Francisco Police Department management staffing and supervision of sworn personnel study
[4] Ibid
[5] Davis and Mateu-Gelabert, 1999
[6] Police Accountability: Current Issues and Research Needs, Samuel Walker, May 2007, NIJ
[7] Gary Melanson deposition, page #15,16, & 19
[8] Unofficial Transcript, page # 2, line # 16
[9] Gary Melanson deposition, page # 19, line #21

Had the HPD not put in place these policies and practices it would have clearly exhibited a glaring disregard for public safety and community order. Without question there was active and on-going criminal activity occurring in the small Pear Tree Road community.  Nearly all of this lawlessness involved the Plaintiff, who was either the victim or suspect in nearly all of these incidents[10].  In the one (1) year period of January 2001 to December 2001, there were a total of eighteen (18) calls for service to the Pear Tree Road community.  Of these eighteen (18) HPD responses, ten (10) involve disturbance calls, or motor vehicle violations resulting from the Plaintiff's activities and/or conduct.  The HPD justifiably put in place reasonable strategies and procedures and correctly responded to this prolonged series of unusual demands for service with changes in their methods of operation, principally requiring a supervisor to respond to all calls for service[11].

It appears that the HPD did respond to each and every request for their services in the Pear Tree Rd., area.  This in and of itself is a remarkable accomplishment, in a city of 60,242[12], where there are countless demands for all forms of police services, which vary from critical incidents to nuisance animal calls.  The HPD responded to all of the calls for service and resolved the issues of concern in a reasonable manner.  Clearly, the HPD has established a custom or policy of responding and resolving all demands for service, regardless of the demographics of the community.

Most noteworthy of these eighteen (18) service calls in 2001, in this small neighborhood, is that eight (8) were in the immediate area of the Hilchey home[13]. This fact clearly substantiates this author's allegation that the Plaintiff was the focal point of the Pear Tree Road community's tribulations.  This series of capricious and antisocial events was clearly established by a neighborhood petition submitted to Chief Brighi, Chief of the HPD. The petition[14] was submitted by thirty-two (32) individuals living in the Pear Tree, Russett Hill, and Cortland Roads neighborhood on September 23, 2001.  In the petition these thirty-two (32) individuals complained that "*Unfortunately our children are getting the idea that if you are the wife of a policeman you have the right to threaten neighbors with a gun, shout profanities throughout the day and night to innocent people walking by, throw glass into the street, and speed to endanger every child in our neighborhood[15]*". In response to these allegations the HPD established the above mentioned policies and protocols to correctly respond to these serious, but inconclusive charges of misconduct.

---

[10] See the exhibits #6 & 7 of the Monigle deposition
[11] Melanson deposition page #19, line #21
[12] 2005 US census estimate
[13] HPD's 2000 & 2001 print list search of reports filed.
[14] Families of Pear Tree Village petition dated 9-23-2001
[15] Ibid, second paragraph

4

It is remarkable to note that in the suburban/rural neighborhood of Pear Tree Rd, Cortland Rd, and Russet Hill Rd, which contains a total of 61 private homes[16]., thirty-two (32) of the community's adults, representing 20 homes or 33% were so alarmed by the conduct of the Plaintiff that they signed a petition requesting police protection from her.

To fully understand the HPD's proactive response one must first consider that the Plaintiff had never been arrested or officially charged with a crime at the time the petition was filed and numerous complaints had been received by the HPD[17]. However, there was substantial evidence of transgressions on the part of the Plaintiff. Specifically, the above referenced eight demands for service in 2001 involving the Plaintiff (see footnote #13) and the allegations made in a petition signed by thirty-three adults living in the immediate vicinity of the Plaintiff. Clearly, to a reasonable certainty the Plaintiff was engaged in a continued and concerted effort to disrupt the neighborhood where she resided. Had the HPD not responded in a significant and proactive manner they, the HPD, would have been negligent. The thirty-three (33) citizens of the Pear Tree Road area made allegations that the Plaintiff was speeding, operating a motor vehicle recklessly in the heavily settled area of Pear Tree Road, threatening citizens, threatening to use a firearm, and breaking glass on public streets. Many of these allegations were substantiated in HPD incident reports[18].

I wish to outline the policies and practices instituted by the HPD designed to respond to disruptive and illegal activity in Pear Tree Road community:

I.   HPD required Officer Hilchey to leave his duty firearm at the HPD station while off-duty and turn-in the balance of his firearms[19] for safe keeping. This was in response to an allegation by Robert Dick[20] of 5 Cortland Road, that the Plaintiff had shouted "*Get the fuck off my property now; I'm going to get my gun. Ron* (HPD Officer Hilchey and the Plaintiff's husband) *go get your gun*". This incident was the result of Mr. Dick attempting to speak to the Hilcheys at their home regarding a property boundary dispute[21]. Mr. Dick simply asked to see the Plaintiff's husband; his request resulted in the Plaintiff responding by violently cursing and threatening to use a firearm. The Plaintiff alleges no further misconduct on the part of Mr. Dick[22].

---

[16] Author's examination of the neighborhood
[17] Pamela Hilchey's deposition
[18] See HPD incident reports for the Pear Tree Road community: 1998 to 2001
[19] Pamela Hilchey's deposition, page #90, line #10
[20] HPD case # HHP9909483
[21] Pamela Hilchey's deposition, page #78, line #16
[22] Pamela Hilchey's deposition, page # 78, 81, 124, & 129

II.     In response the petition's allegations that the Plaintiff was speeding and operating recklessly in the Pear Tree Road community the HPD placed a speed monitoring trailer in the neighborhood and occasionally posted a patrolman in the vicinity to monitor and enforce the speed limit and traffic laws[23]. In addition to the neighborhood petition, the HPD had also recorded several incidents involving confrontations between the Plaintiff and other motorists[24] and pedestrians.

III.    HPD required a patrol supervisor to respond to all calls for service in the Pear Tree Road development[25]. This policy ensured that the level of support and accountability for the responding HPD officers was increased (see footnote # 5) a vital component to ensuring a competent and effective police response and to eliminate any appearance of the lack of impartiality[26]. An experienced supervisor involved in these complex and volatile situations also provided knowledge and acted as a resource for the HPD patrol officers while they investigated and resolved the multifaceted confrontations that so commonly occurred within this small neighborhood.

Had the officials of the HPD not responded to these serious and potentially lethal[27] allegations as described above, they would have clearly been grossly negligent. However is not the case, I find that HPD was presented with substantial evidence of serious misconduct on the part of the Plaintiff and they took a proactive and reasonable approach to these violations of law, while keeping in mind the premise that one is innocent until proven guilty. I find that HPD personnel engaged in effective and constitutional enforcement methods when confronted by the totality of the circumstances.

A third and persuasive example of the reasonable, appropriate, and objective response by the HPD is seen in a traffic confrontation involving the Plaintiff and Jennifer Sternlieb of 46 Pear Tree Road, on October 5, 2001. This incident is significant due to the similarities with the event resulting in the arrest of the Plaintiff. In this case Ms. Sternlieb alleged that the Plaintiff attempted to ram her vehicle while she was stopped on Pear Tree Road. This incident was witnessed by a Nancy Henderson of 22 Pear Tree Road, who confirmed Ms. Sternlieb's account of the incident. In response to this incident HPD Officer Rogers summonsed the Plaintiff to Haverhill District Court for a magistrates hearing on this matter. This clearly is the mildest response possible for an incident witnessed by an independent adult third party, involving a violent felony charge assault with a dangerous weapon (Ch. 265, Sec. 15B).

---

[23] Pamela Hilchey's deposition, pages #120 & 121
[24] HPD case #01010610, dated 10-05-2001
[25] Melanson deposition, page #19, line #21
[26] The Plaintiff was married to a HPD officer
[27] There were allegations of ramming with a vehicle, and threats to use a firearm.

6

**Question #2:** Did the Haverhill Police Department have probable cause to arrest Pamela Hilchey (Plaintiff) on September 7, 2002, for assault with a dangerous weapon, pursuant to Massachusetts General Laws Ch 265, Sec. 15B?

**Existence of Probable Cause** - In the Commonwealth of Massachusetts arrest warrants are issued exclusively by state appointed judges or a clerk magistrates. These court officials may only issue an arrest warrant if they have been provided with sufficient evidence by the requesting law enforcement agency to allow them to form the independent opinion that probable cause exists. If the court official determines that probable cause is present they may then issue the arrest warrant. This is precisely the series of events that occurred immediately prior to the arrest of the Plaintiff. Clearly an independent and unrelated official examined the HPD's evidence regarding the traffic incident, on September 7, 2002, and made the autonomous determination that there was sufficient evidence so as to establish probable cause. This procedure is clearly outlined in the Massachusetts General Laws:

**Chapter 276: Section 22. Warrants, procedure for issuance**

*" Upon complaint made to any justice that a crime has been committed, he shall examine on oath the complainant and any witnesses produced by him, reduce the complaint to writing, and cause it to be subscribed by the complainant, and, if it appears that a crime has been committed, shall issue a summons or warrant in compliance with the provisions of the Massachusetts Rules of Criminal Procedure".*

Probable cause is defined as:

*"A reasonable belief that a person has committed a crime. The test the court of appeals employs to determine whether probable cause existed for purposes of arrest is whether facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe a suspect has committed, is committing, or is about to commit a crime". U.S. v. Puerta, 982 F.2d.*

In this case it is undisputed that HPD Officer Melanson prepared an incident report, court complaint, and combined those documents with victims statements and that package was presented to a magistrate from Haverhill District Court. After reviewing the documents presented to him/her, this officer of the court then made the determination that probable cause did in fact exist and issued an arrest warrant.

The arresting HPD officers had a valid arrest warrant in their possession and executed that warrant. The Massachusetts legislature is clear on the ramifications of the service of warrants in the Massachusetts General Laws, specifically in:

**Chapter 215: Section 34A. Contempt; support or custody orders; costs; service; attorney's fees; interest; IV-D agency; arrest warrants**

*"A law enforcement officer who in the performance of his duties relies in good faith on the warrant appearing in the warrant management system shall not be liable in any criminal prosecution or civil action alleging false arrest, false imprisonment, or malicious prosecution or arrest by false pretense".*

And again in:

**Chapter 276: Section 23A. Warrant management system**

*"No law enforcement officer, who in the performance of his duties relies in good faith on the warrant appearing in the warrant management system and, in turn, the criminal justice information system, shall be liable in any criminal prosecution or civil action alleging false arrest, false imprisonment, or malicious prosecution or arrest by false pretense".*

Cleary, an independent third party and an individual trained to identify probable cause examined the package prepared by HPD officer Melanson and made an assessment that probable cause was present and authorized an arrest warrant for the Plaintiff. The laws of the Commonwealth are equally clear that the officers and their agency cannot be held "*liable in any criminal prosecution or civil action alleging false arrest, false imprisonment, or malicious prosecution or arrest by false pretense*[28]".

With these undisputed factors present there seems to be little doubt that the HPD officers acted legally and appropriately when they placed the Plaintiff under arrest and transported her to the HPD station for processing and bail.

The final factor to consider is did Sergeant Pellot, Officer Melanson, and the HPD follow reasonable and common police practices when they responded to and investigated the September 7, 2002 traffic incident?

To properly answer that question one must first consider the implications of this confrontation:

---

[28] Ch.215 Sec.34A MGLs

Four (4) children (Katelyn Monigle, aged 9 years, Matthew Monigle age 5 years Amanda Bastarache age 9.5 years, and Kevin Regan, aged 7 years) alleged that they had been put in fear of death or serious bodily injury by the Plaintiff due to the operation of her motor vehicle.   Certainly a serious and potentially lethal crime was alleged and the HPD officers were required to conduct a comprehensive investigation into these accusations.

Upon arrival at the home of the complainant, Phyllis Monigle advised them of the alleged violation, this was confirmed by involved children.  It is important to note that law enforcement officers must make their decisions based on the facts and circumstances with which they are confronted with, and no two law enforcement interactions are identical. The undisputable characteristics in this case are:

I.      Officer Melanson's report, title Narrative/Report Summary, dated 9-7-2002 stated that "*Mrs. Monigle informed Officer Melanson that there has been an ongoing dispute with Pamela Hilchey and this Pear Tree neighborhood for the past two years*".  The knowledge of the ongoing confrontation occurring in this neighborhood is also clear in the "*Unofficial Transcript*" of the radio and telephone dispatches.  Specifically, page #2 of this document unmistakably provides the reader with the knowledge that not only the responding officers were aware of the prior problems, but that a supervisor was required to respond to due to these concerns.

II.     A second crucial factor was that the behavior being reported to the HPD was similar to many other documented violations all involving the Plaintiff. Specifically:

- 9/19/1999 – Violent threats the Plaintiff made to Mr. Dick, HPD report # 99-9483
- 12/13/1999 – Violent threats the Plaintiff made to Mr. Dick, HPD report #99-12611
- 6/20/2000 – Violent threats the Plaintiff made to Mr. Dick, HPD report #00-6181
- 10/5/2001 – Violent threats made to children, HPD report #01-0599
- 10/5/2001 - Attempting to ram a Ms. Sternlieb's vehicle, HPD report # 01-0610
- 9/02/2002 – Violent threats the Plaintiff made to Ms. Judge, HPD report #02-7979

Clearly the two investigating officers knew that the behavior being described by Mrs. Monigle and the four children was very similar to the Plaintiff's numerous pervious confrontations.  Most importantly this author in his research has found only a single incident where the Plaintiff was involved in an altercation and claimed to be the victim.

9

III.    Finally, the Plaintiff's husband was a HPD officer and there had been prior allegations[29] from the Pear Tree Rd., neighborhood that the Plaintiff was receiving special treatment due to her husband's employment.

With the above issues present it clearly was reasonable, and probable cause existed, to form the opinion that a complaint summonsing the Plaintiff should be sought in Haverhill District Court for assault with a dangerous weapon. This act would have placed the decision, to charge the Plaintiff, with an impartial 3rd party; a clerk magistrate.

Utilizing sound police practices Sergeant Pellot kept his supervisors, Captain Ratte and Lieutenant Dorr, aware of the situation. These superior officers made the decision to enhance the level of this investigation and required the children and their parents to come into the police station for detailed interviews with experienced investigators, Detectives Dawkins and Dekeon.  This procedure was highly appropriate and reasonable, ensuring a comprehensive investigation of this incident.

It is clear the HPD conducted a detailed examination of the allegations of September 7, 2002.  Ultimately, the reports, victim statements, and related documents were brought before a clerk magistrate who independently formed the opinion that probable cause existed and issued an arrest warrant for the Plaintiff[30].


**Resource Documents Utilized To Form my Opinion:**
9/10/1995 – Vandalism – HPD report # 95-9286
9/19/1999 – Violent threats the Plaintiff made to Mr. Dick, HPD report # 99-9483
12/13/1999 – Violent threats the Plaintiff made to Mr. Dick, HPD
report #99-12611
6/20/2000 – Violent threats the Plaintiff made to Mr. Dick, HPD report #00-6181
6/19/2000 – Threats made to the Plaintiff – HPD report # 00-6168
8/2/2000 – Annoying telephone calls – HPD report # 00-7870
10/5/2001 – Violent threats made to children, HPD report #01-0599
10/5/2001 - Attempting to ram Ms. Sternlieb's vehicle, HPD report # 01-0610
10/30/2001 – Annoying telephone calls – HPD report # 01-1593
8/8/2002 – Larceny – HPD report #02-7111
9/2/2002 – Violent threats the Plaintiff made to Ms. Judge, HPD report #02-7979
9/7/2002 – Assault reports, HPD report # 02-8027
Opinion of James A. Williams
Mapquest documents of the Pear Tree Rd. area
Deposition of Pamela Hilchey
Deposition of Gary Melanson
Letter from Pamela Hilchey to Mayor Guerin

---

[29] See the Pear Tree Rd., neighborhood petition
[30] HPD, Supplemental Report, Off. Melanson, dated 9-8-2002

10

Pear Tree Rd. Petition, 9/23/2001
HPD CAD data for 2000 & 2001
HPD rules and regulations, 3/1976
Unofficial transcript #05-1543A
Plaintiff's proposed exhibit list
CV of James A. Williams
Gary Melanson's answers to Plaintiff's first set of interrogatories
Victor M. Pellot's answers to Plaintiff's first set of interrogatories
Affidavit of Lieutenant Kevin Dorr



Respectfully submitted,



Daniel C. Wicks
29 Chelmsford Road,
Bedford, MA

# Daniel C. Wicks
# 29 Chelmsford Road
# Bedford, MA 01730
# 617-515-6891

-Expert Witness Fee Schedule-

My fee for expert witness services is $150.00 per hour, for review of cases and preparation of an opinion. This fee is payable upon completion of my services.

For deposition and trial testimony the same hourly fee applies, however this rate includes all travel time. Associated costs, such as fuel, food, and tolls, are additional with receipts furnished.

Thank you for considering my services, please contact me at telephone number 617-515-6891, if you have additional questions.

February 16, 2008

**Publications & training manuals authored by Daniel Wicks during the past eight years:**

Massachusetts State Police Seizure of Documents policy
Massachusetts State Police Pursuit policy
Critical review of the Massachusetts Transit Police UOF policy
Use of Deadly Force Policy for the University of Massachusetts at Lowell
Use of Deadly Force training manual for the University of Ma at Lowell
Use of Deadly Force training manual for Bentley College
Responding to Bomb Threats, Mass Criminal Justice Training Council (MCJTC)
Responding to Bar Fights, MCJTC
Responding to Building Searches, MCJTC
Complete Guide to Traffic Stops, MCJTC
Basic Patrol Procedures, MCJTC
Firearms Program for the United States Police Corps, at Weymouth, MA
Traffic Control training manual, Dept. of Conservation and Reservations, MA
Officer Survival Manuel for Framingham, MA Reserve Department
Review of the Massachusetts Transit Police Use of Force Policy
Conducting High Risk Felony Stops, Municipal Police Training Committee, MA
Use of the Police Baton and OC Spray, Lexington Police Department, Lexington MA
Patrol Procedures, Lunenburg Police Department, Lunenburg, MA

# Curriculum Vitae
Daniel C. Wicks
29 Chelmsford Road, Bedford, Massachusetts 01730
617-515-6891

Experience:
◘ Currently a captain in the Massachusetts State Police
◘ Currently the commander of the State Police Traffic Programs Section
◘ Currently a member of the Massachusetts State Police Use of Force Review Committee
◘ Currently a member of the Massachusetts State Police Pursuit Review Committee
◘ Currently the defensive tactics instructor at the Weymouth and MBTA Police Academies.
◘ Currently the patrol procedures instructor at the Boylston Police Academy.
◘ Currently the motor vehicle law instructor at the Lowell Police Academy.
◘ Currently the patrol procedures, courtroom testimony, and interview & interrogation instructor at the Boylston Reserve and Intermittent Police Academy.
◘ Formerly assigned to the Lt. Colonel of Field Services Office to develop policy & procedures
◘ Former shift commander in the Massachusetts State Police.
◘ Former commander of the three Massachusetts State Police zero tolerance teams, an investigative unit, and a motorcycle unit.
◘ A twenty-five year veteran of law enforcement, academy trained in both Massachusetts and New Hampshire police academies.
◘ A total of eighteen years of service as a first and second line supervisor, experienced in all facets of uniform patrol, use of force, crash/criminal investigation and crisis intervention.
◘ Current firearms instructor at the Weymouth Police Academy, Weymouth, MA
◘ Commander of a rapid reaction force during the Democratic National Convention, 2004
◘ Former lead firearms instructor at the U.S. Police Corps Academy, Weymouth, MA, 2004
◘ Former lead defensive tactics instructor at the Lowell, Boylston, and Canton Police Academies
◘ Authored the deadly force manual to transition the Bentley College's police force from unarmed to armed officers, Waltham, MA, 2002
◘ Commanded the 50 officer unit responsible for exterior security and crowd control at he 2000 presidential debate, held at the University of Massachusetts, Boston
◘ Commanded the 20 officer unit responsible for all building security, day to day operations, crowd control, protests and demonstrations at the Massachusetts State House and four additional state buildings, 1999 - 2001
◘ Authored the Complete Guide To Traffic Stops, currently in use at the Boylston and Weymouth Police Academies, 1999
◘ Authored and instructed the program and use of force policy to transition the University of Massachusetts, Lowell's police force from unarmed to armed officers, 1999
◘ Promoted to the rank of lieutenant, 1998
◘ Commander of the Troop A Motorcycle Unit responsible for all administrative functions, day to day operations, as well as dignitary protection: including three visits by the President of the United States, 1998
◘ Acted as the field training coordinator for the recruits from the Massachusetts State Police 73rd Training Troop assigned to Troop A, 1997
◘ Authored the aggressive driver enforcement manual, the "3 D Plan", currently in use by the Massachusetts State Police and it is a nation wide model a t the suggestion of the U.S. Department of Transportation, 1997

◘ Prepared all the operational, traffic and security plans for the three-day Centennial celebration for Revere Beach and then acted as the field coordinator.  This event drew crowds of three quarters of a million people, 1996
◘ Training coordinator and squad leader for the State Police Mobile Field Force (MFF), responsible for riot, drill and ceremony training for the MFF and other New England state police agencies, 1994 - 1995
◘ Supervisor of the zero tolerance team assigned to Salisbury Beach, summers 1994 and 1995
◘ Authored all the operational and security plans for the lodging and practice sites for the seven World Cup Soccer teams that competed in Boston.  Then acted as the coordinator for World Cup security and operations at the lodging and practices sites, 1994
◘ Appointed to the Massachusetts Criminal Justice Training Council committee that selected a state-wide firearms and defensive tactics coordinator, 1994
◘ Supervisor of the zero tolerance teams assigned to patrol the City of Chelsea, 1994
◘ Senior staff instructor at the Massachusetts Criminal Justice Training Council's Burlington Police Academy.  Responsible for State Police in-service and municipal police recruit training, 1992-1993
◘ Selected to serve on the orientation staff for the transitional training of the new Department of State Police, 1992
◘ Promoted to the rank of sergeant, achieving the highest score on the civil service examination within the 660 officer, Metropolitan Police Department, 1989
◘ Coordinator and co-author of the field training and evaluation program used by the Metropolitan Police, and currently in use by several Massachusetts municipal police departments, 1989
◘ Head physical fitness instructor at the Metropolitan Police Academy, Waltham Police Academy, Boylston Police Academy and State Police Burlington Academy, 1988 to 1996
◘ Head defensive tactics instructor at the Metropolitan Police Academy, responsible for certifying new recruits and veteran officers in baton tactics, unarmed self-defense and aerosol agents, 1986 – 1989
◘ Member of the Massachusetts Criminal Justice Training Council Facility Review Committee as a defensive tactics expert, 1989 – 1993
◘ Co-founder of Tenable Defensive Tactics, a private consultation firm serving the training needs of military, police and security agencies throughout New England, 1989
◘ Patrolman for the Town of Exeter, NH Police Department, 1981-1983

Education:
◘ Masters Degree – Criminal Justice, Anna Maria College, Paxton, MA, 1986
◘ Bachelor of Science Degree – Business Administration, University of Lowell, 1980

Seminars Attended:
ASLET conference, Buffalo, NY, 1997, Mobile, AL, 1998, Richmond, VA, 2000, Ontario, CA, 2003, MEMA Critical Incident/Hazardous Materials Response, 1996, Mass State Police Critical Incident Command Program, 1995, Problem Solving Leadership for Quality Driven Performance, 1995, DEA Clandestine Drug Lab Seminar, 1992, Street Survival Seminar, Caliber Press Inc., 2005, 1992, 1989, and 1987, High Risk Incident Tactics, Threat Response Inc., 1991, Barricaded Suspects and Hostage Situations, Threat Response Inc, 1986

Fitness Training:
◘ Cooper Institute for Aerobic Fitness, Advanced Fitness Specialist, 1989
◘ Cooper Institute for Aerobic Fitness, Fitness Specialist, 1988
◘ Massachusetts CJTC Fitness Training Program, 1988

Defensive Tactics Training:
◘ Massachusetts Criminal Justice Training Council certified instructor in defense tactics, baton, handcuffing, knife defense, firearms, shotgun, and patrol rifle, since 1988
◘ Massachusetts Criminal Justice Training Council instructor trainer in use of force, straight and expandable baton, and aerosol agents, since 1998
◘ Massachusetts Criminal Justice Training Council applied patrol procedures coordinator and motor vehicle stops, since 1990
◘ Oleoresin Capsicum Aerosol instructor, REB International Security Training
◘ Maine Criminal Justice Training Council defensive tactics and baton instructor
◘ Pressure Point Control Tactics (PPCT INC.) defensive tactics and baton instructor
◘ US Police Corps arrest and control instructor (160 hour Hicks Program)
◘ Monadnock Training Council instructor trainer in baton
◘ ASP baton instructor
◘ Red Man Inc. Simulations Instructor
◘ Range 2000 Simulations Instructor
◘ Member of the American Society of Law Enforcement Trainers
◘ Unarmed Knife Defense instructor
◘ Pressure Point Control Tactics (PPCT INC.) Spontaneous Knife Defense Instructor

Special Operations Training:
◘ Founding member of the Metropolitan Police Special Operations Unit, assigned as an entry team leader, member for seven years
◘ Graduate of the US Army Special Reaction Team Course
◘ Graduate of the US Army Dignitary Protection Symposium, (two week class)
◘ Graduate of the MA National Guard's Soviet Block Weapons Course
◘ Graduate of Heckler & Koch Inc.'s MP-5 Submachine Gun Course
◘ Graduate of Training Resources International, Close Quarters Battle and Dynamic Entry
◘ National Highway Traffic Safety Administration's Motor Vehicle Stops Master Instructor
◘Graduate of the MCTFT's Highway Vehicle Stops & The Drug Trafficker